**In re FAMILY HEALTH SERVICES, INC., et al., Debtors.**

**In re MAXICARE/HEALTHAMERICA HEALTH PLAN OF ARIZONA, INC. and Maxicare Arizona, Inc., Debtors.**

**Bankruptcy Nos. SA89–01549JW, SA89–01550 through SA89–01594, SA89–02535, SA89–02536, SA89–01584JW and SA89–01585JW.**

United States Bankruptcy Court, C.D. California.

June 9, 1989.

See also, Bkrtcy., 101 B.R. 636.

Peter Wolfson, Myerson & Kuhn, Los Angeles, Cal., for debtors.

Christopher Maisel, Rubinstein & Perry, Los Angeles, Cal., Patrick Cantilo, Admitted Pro Haec Vice for A.W. Pogue, Com'r of Ins. for the State of Tex.

James W. Ryals, Milbank, Tweed, Hadley & McCloy, Los Angeles, Cal., for IBJ Schroder Bank & Trust Co.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

This matter comes before the Court on the motion of the Director of Insurance for the State of Arizona to dismiss or abstain from hearing the petitions filed by Maxicare/HealthAmerica Health Plan of Arizona, Inc. and Maxicare Arizona, Inc. (Maxicare Arizona), for relief under Chapter 11 of the Bankruptcy Code. Group Health Association of America filed an amicus curiae brief in support of the motion. The debtor and Bondholders Committee opposed the motion and IBJ Schroeder Bank & Trust Co., a member of the Bondholders Committee, filed a response supporting the debtor's position.

This is one of a number of motions to dismiss filed by state insurance regulators in the Maxicare cases. The first opinion issued by the court was *In re Family Health Services, Inc. et al./In re Maxicare North Texas, Inc.*, 101 B.R. 618 (1989), and much of the court's analysis in that decision is repeated here.

## BACKGROUND

Family Health Services, Inc. and 45 related corporations, including Maxicare Arizona, filed for relief under Chapter 11 of the Bankruptcy Code on March 15, 1989. Subsequently, two affiliated corporations also filed Chapter 11 petitions. The 48 cases were consolidated for joint administration under Family Health Services, Inc., however, the debtors are commonly and collectively known as "Maxicare." According to the petitions, assets of Maxicare total $2.1 billion and liabilities are $1.4 billion. It appears that there are in excess of 100,000 creditors plus an unknown number of the one million members of Maxicare health plans who may have claims.

Maxicare operates a national network of health maintenance organizations (HMOs) which furnish health care services to approximately one million people. Plan members (also called enrollees) pay a fixed monthly fee, usually through their employer, and are eligible for all covered routine and emergency medical services. Hospitals, doctors, and individual health care professionals provide services to plan members under two fee arrangements with Maxicare. A health care provider agrees either to deliver medical care for a fixed monthly charge, a "capitation" fee, or to render services on a fee for service basis.

Maxicare Arizona is a member of the Maxicare network. At the top of the Maxicare corporate pyramid is Maxicare Health Plans, Inc., a publicly held California corporation. Maxicare Health Plans, Inc. owns 100% of the stock of Maxicare, Inc., a holding company which is also incorporated in California. Maxicare Inc. owns 100% of the stock of Maxicare/HealthAmerica Health Plan of Arizona, Inc., an Arizona corporation, which in turn owns 100% of Maxicare Arizona, Inc., another Arizona corporation.

Maxicare Arizona, as an HMO in the Maxicare network, constitutes part of a large integrated and interdependent system for the provision of health care to Maxicare enrollees. Maxicare provides essential operational, administrative and managerial services, as well as centralized budget planning and marketing for the entire network of Maxicare HMOs. (Ruegger Decl. Ex. A., pp. 7–8).

The clearest evidence of the interrelationship between the Maxicare entities is Maxicare's cash management system. Maxicare HMOs transmit daily both bills and funds to Maxicare, Inc., Maxicare's California HMO. Maxicare, in turn, uses the funds received to pay debts as they are incurred throughout the Maxicare network. Maxicare also lends money to Maxicare HMOs, with such transfers being recorded on the books and records of the individual HMOs. Further, Maxicare Arizona, along with the

other Maxicare entities, submits consolidated financial statements reflecting the overall financial health of the Maxicare network. (Ruegger Decl. Ex. A., p. 17).

Maxicare Arizona HMOs are no longer operated by the debtor. The enrollees of Maxicare Arizona, Inc. were transferred to other HMOs serving the Phoenix area. A sale of the assets of Maxicare/HealthAmerica Health Plan of Arizona, Inc. was approved by the court at a hearing held on May 8, 1989.

Maxicare Arizona is an Arizona corporation which conducted business only within that state. Under Arizona law, the regulation of health care service organizations (HCSOs) includes regulation of HMOs.[1] HMOs in Arizona are regulated by the Director of Insurance pursuant to the Arizona Revised Statutes. Ariz.Rev.Stat.Ann. §§ 20–1051 to –1072 (1975 & Supp.1988).

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a), (d); 28 U.S.C. § 157(b)(2)(A), (O), and general order No. 266 of the United States District Court for the Central District of California.

## ISSUE

The issue is whether Maxicare Arizona is a "domestic insurance company" and therefore not eligible to be a debtor under sections 109(b)(2) and 109(d) of the Bankruptcy Code? 11 U.S.C. § 109(b)(2), (d).

## ANALYSIS

■ Section 109(a) defines who may be a debtor as a person that resides or has a domicile, a place of business, or property in the United States and the term "person" includes individuals, partnerships, and corporations. 11 U.S.C. §§ 109(a), 101(35). The specific exceptions in subsections (b) through (f) of section 109 are the only limits on this broad definition of who may be a debtor.

The applicable subsections of section 109 provide:

(b) A person may be a debtor under chapter 7 of this title only if such person is not—

. . . . .

(2) a domestic insurance company, . . .

. . . . .

(d) Only a person that may be a debtor under chapter 7 of this title, . . . may be a debtor under chapter 11 of this title.

11 U.S.C. § 109(b)(2), (d). Section 109 excludes railroads, domestic insurance companies and banking institutions from eligibility for Chapter 7 relief. In general, to proceed under Chapter 11 an entity must be eligible for Chapter 7 relief.

The Arizona Director of Insurance argues that Maxicare Arizona is a domestic insurance company for section 109 purposes. By comparing and contrasting the regulation of HMOs with other provisions of the Arizona Insurance Code, the Director contends that Arizona classifies Maxicare Arizona as a domestic insurance company. The debtor responds that HMOs in general, and Maxicare Arizona in particular, are not domestic insurance companies as that term is defined by federal case law and Arizona regulatory statutes. Furthermore, the Arizona Attorney General has determined that HMOs are not insurance companies under Arizona law, therefore, Maxicare Arizona is eligible for Chapter 11 relief.

In determining whether an entity is excluded from seeking bankruptcy relief under section 109, federal courts have followed one or more of several approaches. The process of applying traditional rules of statutory construction has come to be known as the *independent classification test.* Courts may consider the classification of an entity under state law, thereby applying the *state classification test.* Finally, at least one court has suggested a third approach and coined the term *alternate relief test.* This court's analysis of

---

1. The Arizona statutes designate health maintenance organizations as "health care service organizations," or "HCSOs." In order to achieve

consistency between this and other opinions, the organizations will be referred to throughout as "HMOs."

the facts under each of these tests leads to the conclusion that Maxicare Arizona is not a domestic insurance company and is therefore eligible for Chapter 11 relief.

## INDEPENDENT CLASSIFICATION TEST

The independent classification test is based upon the court's own construction of the Bankruptcy Code. 2 *Collier On Bankruptcy* ¶ 109.02 (15th ed. 1989). The test is essentially statutory construction by another name. In applying the test, courts have adopted a common sense approach guided by legislative history and traditional rules of statutory construction. *In re Cash Currency Exchange, Inc.,* 37 B.R. 617, 621 (D.C.1984), *aff'd,* 762 F.2d 542 (7th Cir. 1985), *cert. denied,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985).

Beginning with the language of section 109, a "domestic insurance company" may not be a debtor under the Bankruptcy Code. 11 U.S.C. § 109(b), (d). The Code neither defines the term, domestic insurance company, nor mentions health maintenance organizations. Absent a definition, courts have applied traditional rules of statutory construction to determine what entities Congress intended to exclude from bankruptcy relief under section 109.

■ The general rule of statutory construction is that the enumeration of exclusions from the operation of a statute indicates that the statute applies to all cases not specifically excluded. *Expressio unius est exclusio alterius.* 2A *Sutherland Statutory Construction* § 47.23 (Sands 4th ed. 1984). As the Seventh Circuit concluded:

> If congress had intended to make the list of excluded entities illustrative rather than exhaustive, it could have used the rule of statutory construction found in the Bankruptcy Code which provides that the words " 'includes' and 'including' are not limiting." 11 U.S.C. § 102(3). Because Congress chose not to do so, we conclude that the list of excluded entities is intended to be exhaustive.

*Cash Currency,* 762 F.2d at 552.

■ Section 109 broadly defines who may be a debtor subject to a specific and exhaustive list of exclusions. Congress, in choosing to exempt certain organizations from the operation of the bankruptcy laws, must be presumed to narrowly circumscribe the limits of this exemption. *In re Southern Indus. Banking Corp.,* 59 B.R. 978, 982 (Bankr.E.D.Tenn.1986). Absent affirmative action by Congress to expand the application of this provision, section 109 must be narrowly construed.

Section 109 of the Bankruptcy Code adopted the insurance company exclusion under the Bankruptcy Act, adding the words "domestic" and "foreign" to clarify when bankruptcy laws may apply to foreign insurance companies. S.Rep. No. 989, 95th Cong., 2d Sess. 31, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5817; H.R.Rep. No. 595, 95th Cong., 1st Sess. 318, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6275. Former section four of the Bankruptcy Act (11 U.S.C. § 22) provided: "Any person, except a municipal, railroad, insurance, or banking corporation or a building and loan association, shall be entitled to the benefits of this Act as a voluntary bankrupt." 11 U.S.C. § 22 (repealed 1978). The insurance company exclusion was continued essentially unaltered as section 109 of the Code.

Congress chose not to expand or modify the insurance company exception despite two clear opportunities for revision: first, when the Act was codified in 1978 and again, when section 109(b)(2) was amended in 1982. Congress did modify section 109(b) when it expanded the definition of "bank" to include six additional banking entities "or similar institution which is an insured bank." 11 U.S.C. § 109(b)(2). But it did not add similar language to exclude entities that are similar or substantially equivalent to insurance companies.

It may be presumed that Congress was aware of the existence of HMOs when the Code was enacted in 1978. For example, in 1973, Congress passed federal HMO legislation "to provide assistance and encouragement for the establishment and expansion of health maintenance organizations."

S.Rep. No. 129, 93th Cong. 1st Sess. 4, *reprinted in* 1973 U.S.Code Cong. & Ad. News 3033; 42 U.S.C. §§ 300e to 300e–17. From the failure to include HMOs in section 109(b)(2), it may be inferred that Congress intended to make them eligible for bankruptcy relief. *Cash Currency*, 762 F.2d at 552 n. 11. Accordingly, this court finds that HMOs are eligible for bankruptcy relief since they are not specifically excluded by section 109.

Application of the traditional rules of statutory construction to section 109 is dispositive of the primary issue in this case. However, the court takes this opportunity to continue the analysis of these facts under the other tests relied upon by some courts.

## STATE CLASSIFICATION TEST

Under the state classification test the court examines the law of the state of incorporation to determine the character of an entity for section 109 purposes. The analysis begins with whether the state law classifies the entity as one specifically excluded from being a debtor under section 109(b)(2). Next, the court may conduct a functional analysis, comparing the powers of the entity to be classified with those of entities excluded from bankruptcy relief. Finally, the court may examine the state statutes for characteristics common to excluded entities, those entities which conduct business of a public or quasi-public nature and are subject to extensive state regulation including a statutory scheme for liquidation or rehabilitation. *Cash Currency*, 762 F.2d at 548.

Some courts have suggested that the inquiry is complete if the state classifies the entity as one specifically excluded by section 109(b) from being a debtor. *Id.* The Ninth Circuit dealt with this issue in *Security Building & Loan Ass'n v. Spurlock*, 65 F.2d 768 (9th Cir.1933).

In *Spurlock*, the bankrupt appealed from an involuntary petition which designated the bankrupt as a building and loan association. One month after the petition was filed, the Bankruptcy Act was amended to exclude building and loan associations from eligibility for bankruptcy relief. Absent a definition or other guidance within the Act, the appellate court reasoned that a building and loan association was "entirely a creature of state statute and the statute authorizing its creation must necessarily define its characteristics." *Id.* at 771. The court opinion noted that the name of the debtor and the designation in its articles of incorporation as a building and loan association were persuasive if not controlling evidence of its character, though name alone would not be "determinative." *Id.* Before comparing the articles of incorporation with the state statutes, the court observed that the statute reflected the general conception of a building and loan throughout the United States. *Id.* at 772. The court ruled that the bankrupt was a building and loan association and therefore excluded from bankruptcy relief. Here, however, Maxicare Arizona does not purport to be a "domestic insurance company" in its corporate name or under the laws of the state of Arizona. Thus this court's decision is entirely consistent with the Ninth Circuit decision in *Spurlock*.

The Director contends that Maxicare Arizona is a domestic insurance company under Arizona law and that its classification is dispositive of this dispute. Maxicare Arizona responds that according to the Arizona Attorney General, HCSOs, the Arizona equivalent of HMOs, are not insurance companies under Arizona law. It argues that the definitions and provisions of the Arizona insurance laws recognize a fundamental difference between an HMO, which has the power to arrange for health care services, and an insurance company, which indemnifies its policyholders against the cost of such service. The Director's argument is not persuasive.

One clear indication of how Arizona classifies and treats HMOs is the opinion of its senior legal officer, the Arizona Attorney General. He responded to a letter from the Arizona Director of Insurance questioning whether the state would be obligated to use the assets of the Life and Disability Insurance Guaranty Fund to pay the debts of an insolvent HMO. Op. Att'y Gen. I79–

20 (1979). To make this determination, the Attorney General considered whether an HMO was an insurance company under Arizona law.

■ The Attorney General stated that HMOs are generally not considered to be insurers under the insurance laws. He cited Section 20–1068 which specifies the limited number of Title 20 insurance provisions which apply to HMOs. Ariz.Rev.Stat. Ann. § 20–1068 (Supp.1988). Under this provision, the rehabilitation and liquidation article of the Arizona insurance laws applies to HMOs. Ariz.Rev.Stat.Ann. § 20–1066 (Supp.1988). The Director cites these statutes as examples of the Arizona legislature's intent to treat HMOs as insurers. While it is true that statutes regulating Arizona HMOs are found in the Arizona insurance laws and Arizona HMOs are liquidated under the supervision of the Director of Insurance, these facts alone do not support the conclusion that HMOs are domestic insurance companies. *In re Prudence Co.*, 79 F.2d 77, 79 (2nd Cir.1935), *cert. denied*, 296 U.S. 646, 56 S.Ct. 248, 80 L.Ed. 459 (1935). In fact, the provisions of the Arizona insurance laws support the conclusion reached by this court and the Arizona Attorney General that HMOs are not domestic insurance companies.

Arizona law defines HMOs as:

[a]ny person which undertakes to conduct one or more health care plans [and] 'Health care plan' means any contractual arrangement whereby any health care services organization undertakes to provide directly or to arrange for all or a portion of designated basic health care services and to pay or make reimbursement for any remaining portion of such health care services on a prepaid basis through insurance or otherwise. A health care plan shall include basic health care services.

Ariz.Rev.Stat.Ann. § 20–1051 subds. 5, 7 (1975). The definition of insurance is set forth in section 20–103 subd. A as "a contract by which one undertakes to indemnify another or to pay a specified amount upon determinable contingencies." Ariz.Rev. Stat.Ann. § 20–103 subd. A (Supp.1988).

After considering these definitions, the Attorney General concluded as follows:

An [HMO] conducts health care plans. From a legal standpoint, there is no indemnification nor is any contingent event needed in order for the services to be made available. An enrollee in a health care plan operated by an [HMO] simply makes a periodic payment in return for which he is furnished certain specified health care services. We are thus persuaded that [HMOs] do not transact insurance as that term is defined in A.R.S. § 20–103.

Op. Att'y Gen. I7920 (1979). According to the Attorney General of Arizona, HMOs such as Maxicare Arizona are not insurance companies. Therefore, both the Arizona statutes and the Arizona Attorney General classify Maxicare Arizona as an HMO, not a domestic insurance company.

A strikingly similar case arose in Michigan. *Matter of Michigan Master Health Plan, Inc.*, 44 B.R. 642 (Bankr.E.D.Mich. 1984), *rev'd*, 90 B.R. 274 (E.D.Mich.1985). There the bankruptcy judge decided that an HMO was a domestic insurance company and thus ineligible for relief under section 109. On appeal, the district court reversed on the ground that the Michigan Attorney General had ruled, in an official opinion, that the state had not classified HMOs as insurance companies; therefore, the HMO was an eligible debtor. *Id.* at 275.

Since Maxicare Arizona is not classified under state law as a domestic insurance company, the court may conduct a functional analysis to determine whether it exercises the same powers as those entities excluded under section 109. For example, in *Cash Currency*, the Seventh Circuit ruled that a currency exchange was not a banking corporation excluded from the jurisdiction of the bankruptcy court because a currency exchange, although similar to a bank in many respects, lacked the statutory power to accept deposits. *Cash Currency*, 762 F.2d at 550. In the case at bench, the powers of an HMO are compared with those of a domestic insurance company to determine whether they are substantially equivalent entities.

The distinctive function of an HMO is the ability to provide medical services to its members, and insurance companies as a rule do not exercise this function. *Jordan v. Group Health Ass'n*, 107 F.2d 239, 247 (D.C.Cir.1939). In considering whether Group Health Association was illegally engaged in the business of insurance, the *Jordan* court recognized the substantial difference between Group Health Association's agreement to provide medical services and an insurance company's contract to reimburse the cost when or after the service is rendered. *Id.* The court focused not on whether risk was involved but on the primary object or purpose of the medical services plan, and determined that Group Health Association was not subject to state insurance laws. *Id.* at 248. Furnishing medical services is clearly not a traditional function of insurance companies.

The central indispensable element of an insurance company is the underwriting or spreading of risk. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 212, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979), *reh'g denied*, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985). At issue in *Royal Drug* was the validity of price-fixing agreements between pharmacies and a health care insurer. The pharmacies agreed to charge policyholders $2.00 for each prescription drug and receive reimbursement of the cost of acquiring the drug from the insurer. The agreements were entitled to a limited exemption from federal antitrust statutes if the activity was the "business of insurance" for purposes of the McCarran–Ferguson Act. 15 U.S.C. § 1012(b). In defining the "business of insurance," the Court looked to the legislative history of the McCarran–Ferguson Act.

The Supreme Court found that Congress distinguished insurance companies which distribute risk according to hazard, experience and the law of averages, from enterprises, such as manufacturers, which have the ability to control costs. *Royal Drug*, 440 U.S. at 221, 99 S.Ct. at 1073. Since the agreements were arrangements designed to minimize the costs of purchasing goods and services, the Court concluded that the pharmacy agreements were not the "business of insurance." *Id.* at 224, 230, 232, 99 S.Ct. at 1080, 1082, 1084. Thus, the ability to control costs, the foundation of the HMO concept, also distinguishes HMOs from traditional notions of insurance.

An HMO can choose the providers of medical services with which it will contract to care for its enrollees. It may also, and in the vast majority of instances does, pay health care providers a fixed sum, which will not increase or decrease in relation to the actual services rendered. An HMO selects which health care professionals will serve its enrollees and does not assume an "insurance" risk of post-injury payment to its enrollees for any qualified service. For these reasons, an HMO and an insurance company cannot be viewed as equivalents.

The last step under the state classification test is an examination of Maxicare Arizona for characteristics common to entities excluded from bankruptcy relief by section 109(b)(2). These characteristics are regulation under an extensive state statutory scheme, including provision for liquidation or rehabilitation, and the operation of a public or quasi-public business. *Cash Currency*, 762 F.2d at 548.

There can be no question that Arizona law includes a statutory scheme for regulation of HMOs. Ariz.Rev.Stat.Ann. §§ 20–1051 to 1072 (1975 & Supp.1988). Section 20–1066 provides that rehabilitation or liquidation of HMOs shall be deemed to be rehabilitation or liquidation of an insurer. Ariz.Rev.Stat.Ann. § 20–1066 (Supp.1988). Whether or not HMOs are regulated and liquidated under a state statutory scheme, however, is of little assistance in deciding whether an HMO is the substantial equivalent of an insurance company under state law. Maxicare Arizona is not transformed into an insurance company by providing for its liquidation under the supervision of the Arizona Director of Insurance.

Today's ruling is consistent with other decisions which have given little or no weight to statutory liquidation schemes in

applying the state classification test. For example, in *Cash Currency*, the Seventh Circuit held that under the state classification test, a statutory scheme for an entity's liquidation has never been deemed sufficient to classify that entity as one excluded under section 109(b)(2). *Cash Currency*, 762 F.2d at 551; *Prudence*, 79 F.2d at 79. In *Michigan Master*, the district court held that "as of the date the petition in this case was filed a health maintenance organization certainly was not an insurance company under Michigan state law and is likely still not an insurance company." *Michigan Master*, 90 B.R. at 275. In reaching this conclusion, the court adopted the following advice of the Michigan Attorney General:

> [T]he Commissioner of Insurance has been designated the state official to act as custodian or receiver of health maintenance organizations and since the Commissioner is already empowered ... to act as custodian or receiver of insurance companies, the *manner* of custodianship and receivership has been extended to health maintenance organizations. At no point in Michigan law is there an attempt to classify health maintenance organizations, which are in effect medical clinics, as insurance companies.

*Id.* at 277. Thus, the courts have rejected the argument that by providing for liquidation of an entity under the banking or insurance laws, the state thereby classifies the entity as one excluded under section 109(b)(2).

The final inquiry is whether HMOs conduct business of a public or quasi-public nature. HMOs provide health care services, an activity which clearly affects the public interest. The comprehensive statutory scheme for regulating and liquidating Arizona HMOs confirms the state legislature's interest in maintaining the financial stability of HMOs. The Director claims that the Arizona Department of Insurance is in a superior position to handle the insolvency proceedings of Maxicare Arizona including the transfer of enrollees to other health plans. While access to an alternative health care plan is of paramount importance, the enrollees of the two Arizona HMOs have already been transferred to other HMOs. Therefore, the enrollees' interests appear to be adequately protected.

In sum, Arizona law does not classify HMOs as insurance companies and HMOs do not possess or exercise the powers of a domestic insurance company. Therefore, Maxicare Arizona lacks the characteristics common to entities excluded from bankruptcy relief. Under the state classification test Maxicare Arizona is not a domestic insurance company for purposes of section 109(b)(2).

The Director relied heavily on *In re Portland Metro Health, Inc.*, 15 B.R. 102 (Bankr.D.Or.1981). In that case, Bankruptcy Judge Sullivan determined that the debtor, a health maintenance organization, was a domestic insurance company and therefore, not eligible for relief under the Bankruptcy Code. Portland Metro Health, Inc. operated in two states, Oregon and Washington. A two state operation differs significantly from a national network of HMOs which operated in about 15 states. In addition, the *Portland* opinion adopted the state classification test, while this court found the independent classification test decisive. Finally, *Portland Metro* was decided prior to the Seventh Circuit decision in *Cash Currency*, a decision upon which this court relies heavily and which is of greater precedential value. For these reasons, the court declines to adopt the holding in *Portland Metro*.

### ALTERNATE RELIEF TEST

The alternate relief test, a policy based analysis, has been suggested as a third test for determining eligibility for bankruptcy relief under section 109(b)(2). *In re Republic Trust & Sav. Co.*, 59 B.R. 606, 614 (Bankr.N.D.Okla.1986). In crafting the alternate relief approach, the court relied on the broad discretion vested in the bankruptcy courts to serve the purpose and intent of the Bankruptcy Code. The test emphasizes "congressional intent and factors of practicality and policy" thereby combining elements of the state and independent classification tests and adding policy considerations. *Id.* In general, "courts should consider whether a bankruptcy proceeding is a

satisfactory method, compared with available State and Federal non-bankruptcy methods, of reorganizing or liquidating a would-be debtor." *Id.* In essence is a Chapter 11 reorganization proceeding a satisfactory alternative to the statutory liquidation provisions of Texas law?

By proceeding under federal bankruptcy statutes, unsecured creditors of Maxicare Arizona receive the benefit of powers not available to the Director under the Arizona statutes. For example, the committee of unsecured creditors appointed pursuant to section 1102 has authority under section 1103 to investigate the conduct and financial condition of the debtor. 11 U.S.C. §§ 1102, 1103. This committee is an active participant in the case and has the fiduciary duty to act in the best interests of all the unsecured creditors. No similar provision exists under the Arizona insolvency procedures governing HMOs.

Arizona law grants a priority for payment of unpaid claims arising from insurance coverage, which also applies to claims filed by HMO enrollees. This preferential treatment of loss claimants is anathema to the basic tenet of federal bankruptcy law. Equal treatment and distribution to all unsecured creditors is the heart of federal bankruptcy policy. The federal bankruptcy court, with its nationwide jurisdiction and its broad equitable powers, has the ability to reorganize the entire Maxicare network and to ensure equitable treatment for all creditors, not just creditors from Arizona. If the choice here is between a state liquidation of Maxicare Arizona and a global federal reorganization of the debtors and 46 related entities, the practical and policy factors support the conclusion that a proceeding under Chapter 11 is the preferred method of reorganizing Maxicare Arizona.

## CONCLUSION

For the forgoing reasons, the court finds that Maxicare Arizona are eligible debtors under 11 U.S.C. § 109. Accordingly, the motion to dismiss is denied. Counsel for the debtor will prepare, lodge and serve an order denying the motion as required by Bankruptcy Rule 9021 and Local Rule 116(1)(a).