In re **FAMILY HEALTH SERVICES,** **INC. et al., Debtors.**

In re **MAXICARE NORTH** **TEXAS, INC., Debtor.**

**Bankruptcy Nos. SA89–01549JW, SA89– 01550 to SA89–01594, SA89–02535, SA89–02536 and SA 89–01579JW.**

United States Bankruptcy Court, C.D. California.

June 9, 1989.

---

Peter Wolfson, Myerson & Kuhn, Los Angeles, Cal., for debtors.

Christopher Maisel, Rubinstein & Perry, Los Angeles, Cal., Patrick Cantilo, Admitted Pro Haec Vice, for A.W. Pogue, of Ins. for the State of Tex.

James W. Ryals, Milbank, Tweed, Hadley & McCloy, Los Angeles, Cal., for IBJ Schroder Bank & Trust Co.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

This matter comes before the Court on the motion of the Commissioner of Insurance for the State of Texas to dismiss or abstain from hearing the petition filed by Maxicare North Texas, Inc. (MNTexas), for relief under Chapter 11 of the Bankruptcy Code. Group Health Association of America filed an amicus curiae brief in support of the motion. The debtor opposed the motion and IBJ Schroeder Bank & Trust Co., a member of the Bondholders Committee, filed a response supporting the debtor's position.

## BACKGROUND

Family Health Services, Inc. and 45 related corporations, including MNTexas, filed for relief under Chapter 11 of the Bankruptcy Code on March 15, 1989. Subsequently, two affiliated corporations also filed Chapter 11 petitions. The 48 cases were consolidated for joint administration under Family Health Services, Inc., however, the debtors are commonly and collectively known as "Maxicare." According to the petitions, assets of Maxicare total $2.1 billion and liabilities are $1.4 billion. It appears that there are in excess of 100,000 creditors plus an unknown number of the one million members of Maxicare health plans who may have claims. Maxicare operates a national network of health maintenance organizations (HMOs) which furnish health care services to approximately one million people. Plan members (also called enrollees) pay a fixed monthly fee, usually through their employer, and are eligible for all covered routine and emergency medical services. Hospitals, doctors, and individual health care professionals provide services to plan members under two fee arrangements with Maxicare. A health care provider agrees either to deliver medical care for a fixed monthly charge, a "capitation" fee, or to render services on a fee for service basis.

MNTexas is a member of the Maxicare network. At the top of the Maxicare corporate pyramid is Maxicare Health Plans, Inc., a publicly held California corporation. Maxicare Health Plans, Inc. owns 100% of the stock of Maxicare, Inc., a holding company which is also incorporated in California. Maxicare, Inc. owns 100% of the stock of Maxicare Southwest Health Plans, a Texas corporation, which in turn owns 67%

of MNTexas, and Maxicare Inc. owns the remaining 33%.

MNTexas, as an HMO in the Maxicare network, constitutes part of a large integrated and interdependent system for the provision of health care to Maxicare enrollees. Maxicare provides essential operational, administrative and managerial services, as well as centralized budget planning and marketing for the entire network of Maxicare HMOs. (Ruegger Decl. Ex. A., pp. 7–8).

The clearest evidence of the interrelationship between the Maxicare entities is Maxicare's cash management system. Maxicare HMOs transmit daily both bills and funds to Maxicare, Inc., Maxicare's California HMO. Maxicare, in turn, uses the funds received to pay debts as they are incurred throughout the Maxicare network. Maxicare also lends money to Maxicare HMOs, with such transfers being recorded on the books and records of the individual HMOs. Further, MNTexas, along with the other Maxicare entities, submits consolidated financial statements reflecting the overall financial health of the Maxicare network. (Ruegger Decl. Ex. A., p. 17).

MNTexas is a Texas corporation doing business only within that state. HMOs in Texas are regulated by the Commissioner of Insurance pursuant to The Texas Health Maintenance Organization Act. Texas Ins. Code Ann. arts. 20A.01–20A.36 (Vernon 1981 & Supp.1989). On April 13, 1989, Maxicare announced that it will close MNTexas effective April 30, 1989.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a), (d); 28 U.S.C. § 157(b)(2)(A), (O), and general order No. 266 of the United States District Court for the Central District of California.

## ISSUES

The issues are: 1. Is MNTexas a "domestic insurance company" and therefore not eligible to be a debtor under sections 109(b)(2) and 109(d) of the Bankruptcy Code? 11 U.S.C. § 109(b)(2), (d). 2. Should the MNTexas petition for relief be dismissed for cause as a "bad faith filing" under section 1112(b)? 11 U.S.C. § 1112(b). 3. If MNTexas is eligible for bankruptcy relief, should this court abstain from hearing its case pursuant to section 305(a)? 11 U.S.C. § 305(a).

## ANALYSIS

Section 109(a) defines who may be a debtor as a person that resides or has a domicile, a place of business, or property in the United States and the term "person" includes individuals, partnerships, and corporations. 11 U.S.C. §§ 109(a), 101(35). The specific exceptions in subsections (b) through (f) of section 109 are the only limits on this broad definition of who may be a debtor.

The applicable subsections of section 109 provide:

(b) A person may be a debtor under chapter 7 of this title only if such person is not—

.      .      .      .      .

(2) a domestic insurance company, ...

.      .      .      .      .

(d) Only a person that may be a debtor under chapter 7 of this title,.... may be a debtor under chapter 11 of this title.

11 U.S.C. § 109(b)(2), (d). Section 109 excludes railroads, domestic insurance companies and banking institutions from eligibility for Chapter 7 relief. In general, to proceed under Chapter 11 an entity must be eligible for Chapter 7 relief.

The Texas Commissioner of Insurance argues that MNTexas is a domestic insurance company for section 109 purposes. By comparing and contrasting the Texas Health Maintenance Act with other provisions of the Texas Insurance Code, the Commissioner contends that Texas classifies MNTexas as a domestic insurance company or in the alternative, that MNTexas is the substantial equivalent of a domestic insurance company. The debtor responds that HMOs in general, and MNTexas in particular, are not domestic insurance companies as that term is defined by federal case law and Texas regulatory statutes and

are, therefore, eligible for Chapter 11 relief.

In determining whether an entity is excluded from seeking bankruptcy relief under section 109, federal courts have followed one or more of several approaches. The process of applying traditional rules of statutory construction has come to be known as the *independent classification test.* Courts may consider the classification of an entity under state law, thereby applying the *state classification test.* Finally, at least one court has suggested a third approach and coined the term *alternate relief test.* This court's analysis of the facts under each of these tests leads to the conclusion that MNTexas is not a domestic insurance company and is therefore eligible for Chapter 11 relief.

## INDEPENDENT CLASSIFICATION TEST

The independent classification test is based upon the court's own construction of the Bankruptcy Code. 2 *Collier On Bankruptcy* ¶ 109.02 (15th ed. 1989). The test is essentially statutory construction by another name. In applying the test, courts have adopted a common sense approach guided by legislative history and traditional rules of statutory construction. *In re Cash Currency Exchange, Inc.,* 37 B.R. 617, 621 (D.C.1984), *aff'd,* 762 F.2d 542 (7th Cir. 1985), *cert. denied,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985).

Beginning with the language of section 109, a "domestic insurance company" may not be a debtor under the Bankruptcy Code. 11 U.S.C. § 109(b), (d). The Code neither defines the term, domestic insurance company, nor mentions health maintenance organizations. Absent a definition, courts have applied traditional rules of statutory construction to determine what entities Congress intended to exclude from bankruptcy relief under section 109.

■ The general rule of statutory construction is that the enumeration of exclusions from the operation of a statute indicates that the statute applies to all cases not specifically excluded. *Expressio unius est exclusio alterius.* 2A *Sutherland*

*Statutory Construction* § 47.23 (Sands 4th ed. 1984). As the Seventh Circuit concluded:

> If Congress had intended to make the list of excluded entities illustrative rather than exhaustive, it could have used the rule of statutory construction found in the Bankruptcy Code which provides that the words " 'includes' and 'including' are not limiting." 11 U.S.C. § 102(3). Because Congress chose not to do so, we conclude that the list of excluded entities is intended to be exhaustive.

*Cash Currency,* 762 F.2d at 552.

■ Section 109 broadly defines who may be a debtor subject to a specific and exhaustive list of exclusions. Congress, in choosing to exempt certain organizations from the operation of the bankruptcy laws, must be presumed to narrowly circumscribe the limits of this exemption. *In re Southern Indus. Banking Corp.,* 59 B.R. 978, 982 (Bankr.E.D.Tenn.1986). Absent affirmative action by Congress to expand the application of this provision, section 109 must be narrowly construed.

Section 109 of the Bankruptcy Code adopted the insurance company exclusion under the Bankruptcy Act, adding the words "domestic" and "foreign" to clarify when bankruptcy laws may apply to foreign insurance companies. S.Rep. No. 989, 95th Cong., 2d Sess. 31, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5817; H.R.Rep. No. 595, 95th Cong., 1st Sess. 318, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6275. Former section four of the Bankruptcy Act (11 U.S.C. § 22) provided: "Any person, except a municipal, railroad, insurance, or banking corporation or a building and loan association, shall be entitled to the benefits of this Act as a voluntary bankrupt." 11 U.S.C. § 22 (repealed 1978). The insurance company exclusion was continued essentially unaltered as section 109 of the Code.

Congress chose not to expand or modify the insurance company exception despite two clear opportunities for revision: first, when the Act was codified in 1978 and again, when section 109(b)(2) was amended

in 1982. Congress did modify section 109(b) when it expanded the definition of "bank" to include six additional banking entities "or similar institution which is an insured bank." 11 U.S.C. § 109(b)(2). But it did not add similar language to exclude entities that are similar or substantially equivalent to insurance companies.

It may be presumed that Congress was aware of the existence of HMOs when the Code was enacted in 1978. For example, in 1973, Congress passed federal HMO legislation "to provide assistance and encouragement for the establishment and expansion of health maintenance organizations." S.Rep. No. 129, 93th Cong. 1st Sess. 4, *reprinted in* 1973 U.S.Code Cong. & Ad. News 3033; 42 U.S.C. §§ 300e to 300e–17. From the failure to include HMOs in section 109(b)(2), it may be inferred that Congress intended to make them eligible for bankruptcy relief. *Cash Currency,* 762 F.2d at 552 n. 11. Accordingly, this court finds that HMOs are eligible for bankruptcy relief since they are not specifically excluded by section 109.

Application of the traditional rules of statutory construction to section 109 is dispositive of the primary issue in this case. However, the court takes this opportunity to continue the analysis of these facts under the other tests relied upon by some courts.

## STATE CLASSIFICATION TEST

Under the state classification test the court examines the law of the state of incorporation to determine the character of an entity for section 109 purposes. The analysis begins with whether the state law classifies the entity as one specifically excluded from being a debtor under section 109(b)(2). Next, the court may conduct a functional analysis, comparing the powers of the entity to be classified with those of entities excluded from bankruptcy relief. Finally, the court may examine the state statutes for characteristics common to excluded entities, those entities which conduct business of a public or quasi-public nature and are subject to extensive state regulation including a statutory scheme for liquidation or rehabilitation. *Cash Currency,* 762 F.2d at 548.

Some courts have suggested that the inquiry is complete if the state classifies the entity as one specifically excluded by section 109(b) from being a debtor. *Id.* The Ninth Circuit dealt with this issue in *Security Building & Loan Ass'n v. Spurlock,* 65 F.2d 768 (9th Cir.1933.)

In *Spurlock,* the bankrupt appealed from an involuntary petition which designated the bankrupt as a building and loan association. One month after the petition was filed, the Bankruptcy Act was amended to exclude building and loan associations from eligibility for bankruptcy relief. Absent a definition or other guidance within the Act, the appellate court reasoned that a building and loan association was "entirely a creature of state statute and the statute authorizing its creation must necessarily define its characteristics." *Id.* at 771. The court opinion noted that the name of the debtor and the designation in its articles of incorporation as a building and loan association were persuasive if not controlling evidence of its character, though name alone would not be "determinative." *Id.* Before comparing the articles of incorporation with the state statutes, the court observed that the statute reflected the general conception of a building and loan throughout the United States. *Id.* at 772. The court ruled that the bankrupt was a building and loan association and therefore excluded from bankruptcy relief. Here, however, MNTexas does not purport to be a "domestic insurance company" in its corporate name, its articles of incorporation or under the laws of the state of Texas. Thus this court's decision is entirely consistent with the Ninth Circuit decision in *Spurlock.*

The Commissioner contends that MNTexas is a domestic insurance company under Texas law and that its classification is dispositive of this dispute. MNTexas responds that it is regulated under a statutory scheme separate and distinct from domestic insurance companies. It argues that the definitions and provisions of the Texas Insurance Code recognize a fundamental difference between an HMO, which

has the power to arrange for health care services, and an insurance company, which indemnifies its policyholders against the cost of such service. The Commissioner's argument is not persuasive. The Texas State Board of Insurance issued to MNTexas a certificate of authority to transact the business of a *health maintenance organization*. The MNTexas articles of incorporation recited a specific purpose for incorporation: to plan, develop and operate a *health maintenance organization*. While it is true that statutes regulating Texas HMOs are found in the Texas Insurance Code, that fact alone does not support the conclusion that HMOs are domestic insurance companies. *In re Prudence Co.*, 79 F.2d 77, 79 (2nd Cir.1935), *cert. denied*, 296 U.S. 646, 56 S.Ct. 247, 80 L.Ed. 549 (1935). The State of Texas specifically empowered MNTexas to conduct the business of a health maintenance organization, and since Texas law does not classify MNTexas as an entity excluded under section 109, i.e. a domestic insurance company, the Commissioner's position is without merit.

The statutory definitions of an HMO and a health insurance company confirm their separate nature and individual treatment under Texas law. The Texas Insurance Code defines a health insurance ·company as a corporation doing a business involving payment of money conditioned upon loss due to sickness or ill-health. Tex.Ins.Code Ann. art. 3.01(3) (Vernon 1981). Under the Texas Health Maintenance Organization Act (HMO Act) " 'health maintenance organization' means any person who arranges for or provides a health care plan ... to enrollees on a prepaid basis." Tex.Ins. Code Ann. art. 20A.02(j) (Vernon Supp. 1989). This statute also provides:

> 'Health care plan' means any plan whereby any person undertakes to provide, arrange for, pay for, or reimburse any part of the cost of any health care services; provided, however, a part of such plan consists of arranging for or the provision of health care services, as distinguished from indemnification against the cost of such service, on a prepaid basis through insurance or otherwise.

Tex.Ins.Code Ann. art. 20A.02(h) (Vernon 1981). The Texas statutes clearly distinguish between HMOs, which provide health care services, and health insurance companies, which indemnify against the cost of such services. Therefore, under the Texas statutes MNTexas is classified as an HMO, not a domestic insurance company.

Since MNTexas is not classified under state law as a domestic insurance company, this court may conduct a functional analysis to determine whether it exercises the same powers as those entities excluded under section 109. For example, in *Cash Currency*, the Seventh Circuit ruled that a currency exchange was not a banking corporation excluded from the jurisdiction of the bankruptcy court because a currency exchange, although similar to a bank in many respects, lacked the statutory power to accept deposits. *Cash Currency*, 762 F.2d at 550. In the case before this court, the powers of an HMO are compared with those of a domestic insurance company to determine whether they are substantially equivalent entities.

The distinctive function of an HMO is the ability to provide medical services to its members, and insurance companies as a rule do not exercise this function. *Jordan v. Group Health Ass'n*, 107 F.2d 239, 247 (D.C.Cir.1939). In considering whether Group Health Association was illegally engaged in the business of insurance, the *Jordan* court recognized the substantial difference between Group Health Association's agreement to provide medical services and an insurance company's contract to reimburse the cost when or after the service is rendered. *Id.* The Court focused not on whether risk was involved but on the primary object or purpose of the medical services plan, and determined that Group Health Association was not subject to state insurance laws. *Id.* at 248. Furnishing medical services is clearly not a traditional function of insurance companies.

The central indispensable element of an insurance company is the underwriting or spreading of risk. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205,

212, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979), *reh'g denied*, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985). At issue in *Royal Drug* was the validity of price-fixing agreements between pharmacies and a health care insurer. The pharmacies agreed to charge policyholders $2.00 for each prescription drug and receive reimbursement of the cost of acquiring the drug from the insurer. The agreements were entitled to a limited exemption from federal antitrust statutes if the activity was the "business of insurance" for purposes of the McCarran–Ferguson Act. 15 U.S.C. § 1012(b). In defining the "business of insurance," the Court looked to the legislative history of the McCarran–Ferguson Act.

The Supreme Court found that Congress distinguished insurance companies which distribute risk according to hazard, experience and the law of averages, from enterprises, such as manufacturers, which have the ability to control costs. *Royal Drug*, 440 U.S. at 221, 99 S.Ct. at 1078. Since the agreements were arrangements designed to minimize the costs of purchasing goods and services, the Court concluded that the pharmacy agreements were not the "business of insurance." *Id.* at 224, 230, 232, 99 S.Ct. at 1079, 1082, 1083. Thus, the ability to control costs, the foundation of the HMO concept, also distinguishes HMOs from traditional notions of insurance. An HMO can choose the providers of medical services with which it will contract to care for its enrollees. It may also, and in the vast majority of instances does, pay health care providers a fixed sum, which will not increase or decrease in relation to the actual services rendered. An HMO selects which health care professionals will serve its enrollees and does not assume an "insurance" risk of post-injury payment to its enrollees for any qualified service. For these reasons, an HMO and an insurance company cannot be viewed as equivalents.

The agreements between MNTexas and its members were not health insurance policies as that term is defined by Texas law. That law provides that: "Evidence of coverage [by an HMO] does not constitute a health insurance policy as that term is defined by the Insurance Code." Tex.Ins. Code Ann. art. 20A.09(g) (Vernon Supp. 1989). MNTexas has the statutory authority to provide or to arrange for the provision of medical services, a power not given to an insurance company, while it lacks the power to write insurance policies, which all insurance companies must have. Under a functional analysis, MNTexas has the authority and exercises the powers of an HMO, not an insurance company.

■ The last step under the state classification test is an examination of MNTexas for characteristics common to entities excluded from bankruptcy relief by section 109(b)(2). These characteristics are regulation under an extensive state statutory scheme, including provision for liquidation or rehabilitation, and the operation of a public or quasi-public business. *Cash Currency*, 762 F.2d at 548.

There can be no question that The Texas HMO Act includes a statutory scheme for regulation of HMOs. Tex.Ins.Code Ann. arts. 20A.01–.36 (Vernon 1981 & Supp. 1989). The Texas HMO Act provides that rehabilitation or liquidation of HMOs shall be considered rehabilitation or liquidation of an insurance company. Tex.Ins.Code Ann. art. 20A.21 (Vernon Supp.1989). Whether or not HMOs are regulated and liquidated under a state statutory scheme, however, is of little assistance in deciding whether an HMO is the substantial equivalent of an insurance company under state law. MNTexas is not transformed into an insurance company by providing for its liquidation under the supervision of the Texas Commissioner of Insurance.

Today's ruling is consistent with other decisions which have given little or no weight to statutory liquidation schemes in applying the state classification test. For example, in *Cash Currency*, the Seventh Circuit held that under the state classification test, a statutory scheme for an entity's liquidation has never been deemed sufficient to classify that entity as one excluded under section 109(b)(2). *Cash Currency*, 762 F.2d at 551; *Prudence*, 79 F.2d at 79.

In *Matter of Michigan Master Health Plan, Inc.,* 90 B.R. 274, 277 (E.D.Mich. 1985), the district court held that "as of the date the petition in this case was filed a health maintenance organization certainly was not an insurance company under Michigan state law and is likely still not an insurance company." Id. at 275. In reaching this conclusion, the court adopted the following advice of the Michigan Attorney General:

[T]he Commissioner of Insurance has been designated the state official to act as custodian or receiver of health maintenance organizations and since the Commissioner is already empowered ... to act as custodian or receiver of insurance companies, the *manner* of custodianship and receivership has been extended to health maintenance organizations. At no point in Michigan law is there an attempt to classify health maintenance organizations, which are in effect medical clinics, as insurance companies.

*Id.* at 277. Thus, the courts have rejected the argument that by providing for liquidation of an entity under the banking or insurance laws, the state thereby classifies the entity as one excluded under section 109(b)(2).

The Commissioner seeks direct control of MNTexas to gain the full range of powers available under Texas law. Specifically, the Commissioner contends his agency cannot proceed without funding as provided by Texas law. Art. 20A.36(c) permits the levy of an assessment on viable HMOs operating in the state to finance the administrative expenses of liquidating or rehabilitating an ailing HMO. Tex.Ins.Code Ann. art. 20A.36(c) (Vernon Supp.1989). The statute requires healthy HMOs in Texas to help solve financial problems of ailing ones, like MNTexas, but requires no contribution from insurance companies which issue health care insurance, the entities which according to the Commissioner are equivalent. This is yet another example of how Texas affords different treatment to HMOs and insurance companies.

The final inquiry is whether HMOs conduct business of a public or quasi-public nature. HMOs provide health care services, an activity which clearly affects the public interest. The comprehensive statutory scheme for regulating and liquidating Texas HMOs confirms the Texas legislature's interest in maintaining the financial stability of HMOs. The Commissioner contends that Congress excluded insurance companies, and by analogy HMOs, from federal bankruptcy relief in recognition of the police powers vested in the states to protect the health and welfare of its citizens. But most corporations chartered under state law are subject to the state's police powers, nevertheless, they are eligible debtors under section 109.

The Commissioner claims that the Texas Department of Insurance is in a superior position to handle the insolvency proceedings of MNTexas including the transfer of enrollees to other health plans. While access to an alternative health care plan is of paramount importance, the Commissioner in cooperation with MNTexas began and continued this transfer process while MNTexas was a Chapter 11 debtor in possession. Therefore, the enrollees' interests appear to be adequately protected.

In sum, Texas law does not classify HMOs as insurance companies and HMOs do not possess or exercise the powers of a domestic insurance company. Therefore, MNTexas lacks the characteristics common to entities excluded from bankruptcy relief. Under the state classification test MNTexas is not a domestic insurance company for purposes of section 109(b)(2).

The Commissioner relied heavily on *In re Portland Metro Health, Inc.,* 15 B.R. 102 (Bankr.D.Or.1981). In that case, Bankruptcy Judge Sullivan determined that the debtor, a health maintenance organization, was a domestic insurance company and therefore, not eligible for relief under the Bankruptcy Code. Portland Metro Health, Inc. operated in two states, Oregon and Washington. A two state operation differs significantly from a national network of HMOs which operated in about 15 states. In addition, the *Portland Metro* opinion adopted the state classification test, while this court found the independent classifica-

tion test decisive. Finally, *Portland Metro* was decided prior to the Seventh Circuit decision in *Cash Currency,* a decision upon which this court relies heavily and which is of greater precedential value. For these reasons, the court declines to adopt the holding in *Portland Metro.*

### ALTERNATE RELIEF TEST

The alternate relief test, a policy based analysis, has been suggested as a third test for determining eligibility for bankruptcy relief under section 109(b)(2). *In re Republic Trust & Sav. Co.,* 59 B.R. 606, 614 (Bankr.N.D.Okla.1986). In crafting the alternate relief approach, the court relied on the broad discretion vested in the bankruptcy courts to serve the purpose and intent of the Bankruptcy Code. The test emphasizes "congressional intent and factors of practicality and policy" thereby combining elements of the state and independent classification tests and adding policy considerations. *Id.* In general, "courts should consider whether a bankruptcy proceeding is a satisfactory method, compared with available State and Federal non-bankruptcy methods, of reorganizing or liquidating a would-be debtor." *Id.* In essence is a Chapter 11 reorganization proceeding a satisfactory alternative to the statutory liquidation provisions of Texas law?

By proceeding under federal bankruptcy statutes, unsecured creditors of MNTexas receive the benefit of powers not available to the Commissioner under the Texas statutes. For example, the committee of unsecured creditors appointed pursuant to section 1102 has authority under section 1103 to investigate the conduct and financial condition of the debtor. 11 U.S.C. §§ 1102, 1103. This committee is an active participant in the case and has the fiduciary duty to act in the best interests of all the unsecured creditors. No similar provision exists under the Texas insolvency procedures governing HMOs.

Texas law grants a priority for payment of loss over other claims which also applies to claims filed by HMO enrollees. This preferential treatment of loss claimants is anathema to the basic tenet of federal bankruptcy law. Equal treatment and distribution to all unsecured creditors is the heart of federal bankruptcy policy. The federal bankruptcy court, with its nationwide jurisdiction and its broad equitable powers, has the ability to reorganize the entire Maxicare network and to ensure equitable treatment for all creditors, not just creditors from Texas. If the choice here is between a state liquidation of MNTexas and a global federal reorganization of the debtor and 47 related entities, the practical and policy factors support the conclusion that a proceeding under Chapter 11 is the preferred method of reorganizing MNTexas.

### MOTION TO DISMISS FOR CAUSE UNDER SECTION 1112(b)

The Commissioner moved to dismiss MNTexas' petition for cause, pursuant to section 1112(b), on the ground that it was not filed in good faith. The Commissioner alleges that MNTexas was on notice that under Texas law it is a domestic insurance company not entitled to be a debtor under the Code and that it represented in a Form 10–Q dated September 30, 1988, and filed with the Securities and Exchange Commission, that it would not file for bankruptcy relief. The court has determined that MNTexas is not a domestic insurance company and therefore is an eligible Chapter 11 debtor. Therefore, the remaining issue before the court is whether the debtor's misstatement of law contained in the Form 10–Q rises to the level of bad faith necessary to justify dismissal of this bankruptcy petition under section 1112(b).

The essential requirement for a good faith bankruptcy filing is a bona fide desire to reorganize. "Where the debtor is motivated by a legitimate reorganization purpose and not solely or predominantly by the desire to prevent foreclosure or hinder creditors, bad faith is not present." *In re Spenard Ventures, Inc.,* 18 B.R. 164, 167–68 (Bankr.D.Ala.1982). The only evidence presented by the Commissioner was the statements in the Form 10–Q regarding the presumed ineligibility of some Maxicare affiliates to file bankruptcy.

The Bankruptcy Appellate Panel for the Ninth Circuit recognized the following factors which are usually present in cases not filed in good faith:

(1) The debtor has only one asset.

(2) The secured creditors' lien encumbers that asset.

(3) There are generally no employees except for the principals.

(4) There is little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments.

(5) There are few, if any, unsecured creditors whose claims are relatively small.

(6) There are allegations of wrongdoing by the debtor or its principals.

(7) The debtor is afflicted with the "new debtor syndrome" in which a one-asset equity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors.

(8) Bankruptcy offers the only possibility of forestalling loss of the property.

*In re Stolrow's, Inc.*, 84 B.R. 167, 171 (Bankr. 9th Cir.1988). The Commissioner does not allege even one of these factors in support of the motion to dismiss MNTexas' petition as a "bad faith" filing. He simply relies on the statements contained in the 10–Q filing. That document included legal speculations and did not constitute a promise by any Maxicare affiliate to refrain from seeking bankruptcy relief. Such a promise to waive the right to file bankruptcy would be unenforceable. *In re Howe*, 78 B.R. 226, 228 (Bankr.D.S.D.1987). The misstatements of law contained in the debtor's Form 10–Q do not rise to the level of bad faith necessary to justify dismissal of MNTexas' petition pursuant to section 1112(b).

The Commissioner failed to show that MNTexas had any improper motive for filing its Chapter 11 petition or to present any evidence of MNTexas' bad faith in filing for bankruptcy relief. Accordingly, this court denies the motion to dismiss for cause as a "bad faith" filing under section 1112(b).

## MOTION FOR ABSTENTION

■ The Commissioner requests that the court dismiss the MNTexas case or sus-pend the proceedings pursuant to either section 305(a)(1) or the abstention doctrine of *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In support, the Commissioner contends that reorganization proceedings under Texas law will better serve the interests of creditors of MNTexas and that withdrawal is appropriate in light of the existence of a complex state regulatory scheme for insurance companies. The court finds neither assertion persuasive.

Section 305 provides:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension; ...

11 U.S.C. § 305(a)(1).

The Commissioner has presented no evidence that all creditors will benefit from state reorganization of MNTexas. That Texas creditors might benefit from state reorganization of MNTexas by itself is not the controlling factor. Furthermore, the Ninth Circuit has held that "[p]referential treatment of one state's resident creditors over another state's is impermissible under the Bankruptcy Act." *In re Visiting Home Services, Inc.* 643 F.2d 1356, 1360 (9th Cir.1981). Clearly, a global reorganization of the entire Maxicare network under federal bankruptcy law is the preferred method of protecting all creditors and all enrollees, nationwide.

In the alternative, the Commissioner relies on the *Burford* abstention doctrine to support the motion. *Burford* involved Texas' complex oil conservation scheme. The Supreme Court recognized that "[c]onflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts." *Burford*, 319 U.S. at 334, 63 S.Ct. at 1107. The Court found that federal abstention was appropriate in *Burford* where Texas provided a unified method for the formation of policy and an expeditious and adequate judicial review of the state regulatory com-

mission's administrative decisions, and ultimate review of the federal questions was fully preserved. *Id.* at 333–34, 63 S.Ct. at 1107–1108. The Commissioner's reliance on *Burford* is misplaced.

The abstention doctrine was not applied by the Seventh Circuit when confronted with state insolvency proceedings of an entity not barred from federal bankruptcy relief under Section 109(b). "Because of the paramountcy of federal bankruptcy law, the policies underlying the abstention doctrine have little or no force in a case in which a proper debtor pursues his right to seek relief under the Code." *Cash Currency*, 762 F.2d at 556. The court has determined that MNTexas may be a debtor under the Bankruptcy Code. Accordingly, the court denies the motion to abstain.

## CONCLUSION

For the foregoing reasons, the court finds that MNTexas is an eligible debtor under 11 U.S.C. § 109; that the debtor did not file this case in bad faith and that the court should not abstain. Accordingly, the motions to dismiss and the motion to abstain are denied. Counsel for the debtor will prepare, lodge and serve an order denying the motions as required by Bankruptcy Rule 9021 and Local Rule 116(1)(a).