**In re BEACON HEALTH, INC., Debtor.**

**Bankruptcy No. 89–702.**

United States Bankruptcy Court,
D. New Hampshire.

Sept. 18, 1989.

---

William S. Gannon, Wadleigh, Starr Offices, Manchester, N.H., for Beacon Health.

Douglas N. Jones, Asst. Atty. Gen., Civ. Bureau, Concord, N.H., for N.H. Dept. of Ins. and Ins. Com'r Louis E. Bergeron.

Lawrence M. Edelman, Hampton, N.H., for Robert L. Vaccaro and Jacqueline E. Vaccaro.

MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This chapter 11 case is presently before the court upon a Motion to Dismiss, filed by the New Hampshire Insurance Department and Insurance Commissioner Louis E. Bergeron ("the State"). Objections have been filed by Robert L. Vaccaro and Jacqueline E. Vaccaro, and by debtor Beacon Health, Inc. ("Beacon"). The court took evidence and heard oral argument on this matter on the 16th, 21st, and 23rd of August, 1989.

The State requests dismissal of this chapter 11 case or, in the alternative, for a declaratory ruling that certain administrative and state court regulatory proceedings involving Beacon's health insurance activities may properly continue without regard to the automatic stay provision of section 362(a) of the Bankruptcy Code.

For the reasons stated in this memorandum opinion, the court holds that for purposes of the Bankruptcy Code the debtor is a "domestic insurance company" within the meaning of 11 U.S.C. § 109(b)(2) and (d) and, accordingly, Beacon cannot be a debtor under chapter 11 of the Bankruptcy Code.

## FACTS

Beacon is a New Hampshire corporation chartered by the State on May 21, 1984 as a "for profit" health maintenance organization (HMO) regulated by the New Hampshire Insurance Department under the provisions of RSA Chapter 420–B, entitled "Health Maintenance Organizations". A certificate of authority to operate as an HMO was issued to Beacon by the Insurance Department on August 21, 1984 pursuant to RSA 420–B:5.

In July of 1989, the State determined that Beacon's surplus was deficient by at least $500,000, and that the company was insolvent. An informal demand for $500,000 additional capital was made to Beacon. Beacon indicated that it was unable to generate that amount and requested an opportunity to seek a qualified buyer to assume control of its health insurance business. The State agreed to defer liquidation proceedings for a reasonable period while Beacon negotiated with potential buyers. Beacon was given until July 31, 1989 to produce the necessary additional surplus. On the afternoon of July 31, 1989, Beacon advised the State that it could not produce the additional capital and had not located a qualified buyer.

On August 1, 1989 (at approximately noon), the State filed a petition in Merrimack County Superior Court pursuant to RSA 402–C:20 seeking a judicial declaration of insolvency and authority to liquidate Beacon. On August 1, 1989, the State also commenced an administrative action pursuant to RSA 420–B:13 that directed Beacon to show cause why its insurance license should not be revoked on the grounds that it no longer possessed the necessary financial qualifications to operate in accordance with RSA 420–B:5.

Beacon filed for relief under chapter 11 of the Bankruptcy Code on August 1, 1989. According to the petition, assets of Beacon total $278,000 and liabilities total $1,189,000. From the schedules filed on August 17, 1989, it appears that there are 226 unsecured creditors, plus an unknown number of "enrolled participants" in Beacon health plans who may have claims.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (d), 28 U.S.C. § 157(b)(2)(A) and (O), and the general reference order dated February 1, 1985 entered by the district judges to the undersigned with regard to bankruptcy cases.

## ANALYSIS

Section 109 of the Bankruptcy Code defines who may be a debtor. This section provides that a "domestic insurance company" may not be a debtor under chapter 7 or chapter 11 of the Bankruptcy Code. 11 U.S.C. § 109(b)(2) and (d). This court must determine whether an HMO, specifically Beacon, is within the definition of a "domestic insurance company" such as to be excluded from federal relief under section 109 of the Bankruptcy Code.

The State maintains that Beacon is an insurance company for section 109 purposes because, regardless of its classification as an HMO, Beacon is engaged in the business of insurance. The State asserts that state legislation enacted in 1989 "clearly reflects an intention to treat health maintenance organizations in the same manner as other insurers for all purposes which may be relevant to the instant bankruptcy proceeding." The debtor responds that "the weight of authority favors the position that health maintenance organizations are not domestic insurance companies," and the court should therefore deny the State's Motion to Dismiss.

There are several approaches for determining whether an entity is excluded from federal bankruptcy relief under section 109. See, e.g., *In re Cash Currency Exchange, Inc.,* 37 B.R. 617 (D.C.1984), *aff'd*

762 F.2d 542 (7th Cir.), *cert. denied,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985) (The "independent classification test" approach: court applies traditional rules of statutory construction); *In re Portland Metro Health,* 15 B.R. 102 (Bankr.D.Ore.1981) (The "state classification test" approach: court considers the classification of the entity under state law); and *In re Republic Trust & Savings Co.,* 59 B.R. 606 (Bankr.N.D.Okla.1986) (The "alternate relief test" approach: court considers the purpose and intent of the Bankruptcy Code). This court's analysis under each of these approaches leads to the conclusion that Beacon is a domestic insurance company and therefore is ineligible for chapter 11 relief.

### The "Independent Classification Test" Approach

The "independent classification test" is basically a statutory construction analysis by the bankruptcy courts "based upon their own definitions of the words of the Bankruptcy Code." 2 *Collier on Bankruptcy,* para. 109.02 at 109–14 (15th ed. 1979). "In applying the test, courts have adopted a common sense approach guided by legislative history and traditional rules of statutory construction." *In re Family Health Services, Inc./In re Maxicare North Texas, Inc.,* 101 B.R. 618, 621 (Bankr.C.D.Cal. 1989) (hereinafter referred to as "Maxicare") citing *In re Cash Currency Exchange, Inc.,* 37 B.R. at 621.

Section 109 of the Bankruptcy Code provides that a "domestic insurance company" may not be a debtor. 11 U.S.C. § 109(b) and (d). "The Code neither defines the term, domestic insurance company, nor mentions health maintenance organizations. Absent a definition, courts have applied traditional rules of statutory construction to determine what entities Congress intended to exclude from bankruptcy relief under section 109." *Maxicare,* 101 B.R. at 621.

The legislative history of section 109 indicates that "insurance companies are excluded from liquidation under the bankruptcy laws because they are bodies for which alternative provision is made for their liquidation under various regulatory laws." HR Rep. No. 95–595, 95th Cong, 1st Sess. 318–19 (1977); S.Rep. No. 95–989, 95th Cong, 2d Sess. 31 (1977), U.S.Code Cong. & Admin.News 5787, 5817, 6275. The rationale for excluding insurance companies from protection under the Bankruptcy Code was explained in *Sims v. Fidelity Assur. Ass'n,* 129 F.2d 442, 448–449 (4th Cir.1942):

> No reasons for making these exceptions were assigned by the committees of Congress, but they may be surmised to lie in the public or quasi public nature of the business, involving other interests than those of creditors, in the desirability of an unarrested operation, the completeness of state regulation, including provisions for insolvency, and the inappropriateness of the bankruptcy machinery to their affairs. These considerations all apply to insurance corporations.... The most natural inference is that Congress meant to leave to local winding-up statutes the liquidation of such companies; that since the state commonly kept supervision over them during their lives, it was reasonable that they should take charge of their demise.

In order to determine whether Beacon is a domestic insurance company for section 109 purposes, the court must determine whether the aforementioned bases for excepting insurance companies from federal bankruptcy relief are applicable in this case. That is, does Beacon have attributes that are substantially equivalent to those of an insurance company such that the rationale for excepting insurance companies from federal bankruptcy relief also applies to Beacon? Under this analysis, in regard to HMOs specifically, courts have considered whether the HMO is engaged in the "business of insurance". See, e.g., *In re Portland Metro Health, Inc.,* 15 B.R. 102 (Bankr.D.Ore.1981) and *In re Maxicare,* 101 B.R. 618 (Bankr.C.D.Cal.1989), coming to different conclusions.

In a different but somewhat analogous nonbankruptcy context, the courts have also had to address the fundamental under-

lying concept involved in insurance. In *Group Life Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 *reh'g denied* 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), *cert. denied after remand* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985), the Supreme Court described the "primary elements of an insurance contract" as "the spreading and underwriting of a policy holder's risk." *Id.* at 211, 99 S.Ct. at 1073. The definition of the "business of insurance" was expanded upon in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), in which the Supreme Court identified "three criteria relevant in determining whether a particular practice is part of the 'business of insurance' exempted from the antitrust laws." *Id.* at 129, 102 S.Ct. at 3009. These three criteria are:

First, whether a particular practice has the effect of transferring or spreading a policy holder's risk;

Second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and

Third, whether the practice is limited to entities within the insurance industry.

*Id.*, cited in *Ocean State Physicians Health Plan, Inc., et al. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1107 (1st Cir.1989), *affirming* 692 F.Supp. 52 (D.R.I.1988).

### The "State Classification Test" Approach

In *In re Portland Metro Health, Inc.*, 15 B.R. 102 (Bankr.D.Ore.1981), the bankruptcy court ruled that, in determining whether an HMO is eligible for relief under chapter 11 of the Bankruptcy Code, "the bankruptcy court must evaluate the state's classification of the debtor as an insurer in light of the debtor's actual operation." *Id.* at 104. Under this so-called "state classification test", entities are excluded from relief under the Bankruptcy Code if they have the following characteristics:

(1) They are extensively regulated by well-organized departments of the State and of the United States;

(2) They are subject to express statutory procedures for nonbankruptcy liquidation; and

(3) The nature of the business is public or quasi-public and involves interests other than those of creditors.

*Id.*, citing *In re First American Bank and Trust Company*, 540 F.2d 343 (8th Cir. 1976).

In *Portland*, the court determined that the HMO at issue was a "domestic insurance company" based upon the following factors:

(1) The HMO was classified by the state as an insurer for regulatory purposes;

(2) The HMO held certificates of authority from two states to transact insurance business;

(3) The HMO was extensively regulated by the state as an insurance company; and

(4) The HMO determined its subscriber rate based upon a projected risk factor calculated by a professional with the goal of minimizing its exposure to loss.

The *Portland* court also found that the debtor-HMO had risk-spreading features similar to insurance companies sufficient to find that it was within the meaning of section 109, even though the HMO at issue underwrote and assumed the subscribers' risk entirely through the means of provider contracts, and did not directly indemnify subscribers. *Id.* at 105.

In *Maxicare*, 101 B.R. 618 (Bankr.C.D. Cal.1989), the bankruptcy court did a three-part analysis under the "state classification test" to determine whether a national network of forty-eight HMOs were eligible for chapter 11 relief:

(1) Does state law classify the entity as one specifically excluded from being a debtor under § 109(b)(2):

(2) Is the entity substantially equivalent to excluded entities; and

(3) Does state law attribute characteristics to the entity that are common to excluded entities, that is, does the entity "conduct business of a public or a quasi-public nature [that is] subject to extensive state regulation including a statu-

tory scheme for liquidation or rehabilitation."

*Id.* at 622 (citations omitted). The *Maxicare* court considered the state statutory definitions of an HMO and of a health insurance company and found that, because "[t]he Texas statutes clearly distinguish between HMOs, which provide health care services, and health insurance companies, which indemnify against the cost of such services," the HMO at issue was not classified under state law as a domestic insurance company. *Id.* at 623.

The court then applied a "functional analysis" to determine whether HMOs and health insurance companies are "substantially equivalent entities". *Id.* at 623. This analysis is essentially a determination as to whether the HMO is engaged in the "business of insurance". The *Maxicare* court concluded that HMOs and insurance companies are not equivalent entities, based upon the following:

> The distinctive function of an HMO is the ability to provide medical services to its members, and insurance companies as a rule do not exercise this function.... [there is a] substantial difference between ... [an] agreement to provide medical services and an insurance company's contract to reimburse the cost when or after the service is rendered.... Furnishing medical services is clearly not a traditional function of insurance companies. The central indispensable element of an insurance company is the underwriting or spreading of risk....
> [T]he ability to control costs, the foundation of the HMO concept, also distinguishes HMOs from traditional notions of insurance. An HMO can choose the providers of medical services with which it will contract to care for its enrollees. It may also, and in the vast majority of instances does, pay health care providers a fixed sum, which will not increase or decrease in relation to the actual services rendered. An HMO selects which health care professionals will serve its enrollees and does not assume an "insurance" risk of post-injury payment to its enrollees for any qualified service.... The agreements between [the HMO] and its mem-

bers were not health insurance policies as that term is defined by Texas law. *Id.* at 623–624 (citations omitted).

The *Maxicare* court also analyzed the facts under the "independent classification test" and the "alternate relief test" and concluded that HMOs are not domestic insurance companies and that they are therefore eligible for relief under the Bankruptcy Code.

The *Maxicare* case is distinguishable from this case. The *Maxicare* case involves a national network of HMOs in over forty states. "At the top of the Maxicare corporate pyramid is Maxicare Health Plans, Inc., a publicly held California corporation. Maxicare Health Plans, Inc. owns 100% of the stock of Maxicare, Inc., a holding company which is also incorporated in California. Maxicare, Inc. owns 100% of the stock of Maxicare Health Plans of the Midwest, Inc., an Illinois corporation, which in turn owns 100% of Maxicare Health Insurance company." *Maxicare*, 101 B.R. 618, 619. The Maxicare network is a "large, integrated and interdependent system for the provision of health care to Maxicare enrollees. Maxicare provides essential operational, administrative, and managerial services, as well as centralized budget planning and marketing for the entire network of Maxicare HMOs." *Id.*

The situation before this court, in sharp contrast to Maxicare, involves an HMO incorporated in only one state. Beacon only operates in any meaningful sense in New Hampshire. Subscribers have to live within the service area, which is New Hampshire and several communities in southeast Maine, although some provider contracts are with outside hospitals and doctors. The *Maxicare* court recognized this distinction itself when it sought to differentiate between the facts of its case and the facts of the *Portland Metro* case: "Portland Metro Health, Inc. operated in two states, Oregon and Washington. A two state operation differs significantly from a national network of HMOs which operated in about 15 states." *Id.* at 625.

Under the "state classification test" the court must analyze Beacon's treatment under state law, which includes consideration of the actual classification of Beacon under state law as well as consideration of such classification in light of Beacon's operations, including whether Beacon is essentially engaged in the "business of insurance".

Title XXXVII of the New Hampshire Revised Statutes Annotated, entitled "Insurance", contains the chapter in which regulation of health maintenance organizations is set forth, RSA Chapter 420–B, entitled "Health Maintenance Organizations". The fact that the statutes regulating New Hampshire HMOs are found in the New Hampshire Insurance Title is relevant. However "that fact alone does not support the conclusion that HMO's are domestic insurance companies." *In re Maxicare* 101 B.R. 618, 623 (Bankr.C.D.Cal.1989), citing *In re Prudence Co.*, 79 F.2d 77, 79 (2d Cir.), *cert. denied,* 296 U.S. 646, 56 S.Ct. 247, 80 L.Ed. 549 (1935).

Pursuant to RSA 420–B, the New Hampshire Insurance Department issues certificates of authority to HMOs, allowing them to operate, and thereafter the department exercises its regulatory authority over such licensed HMOs. Among other things, RSA 420–B authorizes the Insurance Department to:

1. Review and approve an HMO's application for a certificate of authority under standards that require a finding by the Insurance Commissioner that the applicant is "safe, reliable, and entitled to confidence, and [that] the company continues to conduct a meaningful business in New Hampshire." RSA 420–B:5–a (Supp.1989; Laws of 1989, Chapter 186:2);

2. Require an HMO to apply for a new certificate of authority upon a finding that an HMO "has undergone a substantial change in finances or managerial control." RSA 420–B:5–b (Supp.1989; Laws of 1989, Chapter 186:2);

3. Review and approve an HMO's "evidence of coverage" (which means "any certificate, agreement, or contract issued to an enrolled participant setting out the coverage to which he is entitled." RSA 420–B:1(II)) prior to implementation. RSA 420–B:8(I);

4. Review and approve all rates prior to implementation by an HMO. Rates shall be "reasonable in relation to the benefits and health care services provided and not excessive, inadequate or discriminatory." RSA 420–B:8(I) and (IV);

5. Conduct financial examinations of HMOs and their "providers" at least once every three years and whenever necessary. RSA 420–B:10;

6. Require HMOs to provide reasonable procedures for resolving written complaints by "enrolled participants" (also known as "subscribers") and to record the disposition of such complaints. RSA 420–B:11;

7. Regulate HMOs under RSA 417 (unfair insurance practices) and RSA 406–A (false advertising by unauthorized insurers). RSA 420–B:12;

8. Require HMOs to maintain a minimum net worth that satisfies the statutory minimum prescribed. RSA 420–B:25 (Supp.1989; Laws of 1989: Chapter 186:5);

9. Regulate HMOs under RSA 402–C, the "Insurers Rehabilitation and Liquidation Act." RSA 420–B:20(III) (Supp. 1989; Laws of 1989, Chapter 186:4); and

10. Formulate regulations to further implement these statutory requirements. RSA 420–B:21.

It should be especially noted that in New Hampshire the rates that an HMO may charge are determined by actuarial computations supervised by the Insurance Commissioner, see *N.H.Admin.Ins.* 2201.05 and an HMO cannot charge any rates unless authorized by the Insurance Commissioner. The Insurance Commissioner is also authorized to require reinsurance agreements for HMOs. All of the foregoing attributes are key attributes of an insurance company. In my judgment, there are ultimately three key attributes to an insurance company: (1) Actuarial determination of cost; (2) Rates/premiums that are charged to sub-

scribers subject to approval by a regulatory authority; and (3) There are provisions for reinsurance to back up the insurance entity's obligations.

Moreover, the New Hampshire legislature has enacted express statutory procedures that provide for the liquidation or rehabilitation of HMOs. See RSA 420–B:20(III) (Supp.1989; Laws of 1989, Chapter 186:4). The statute under which HMOs would be either rehabilitated or liquidated, RSA 402–C, even refers to reorganization plans in rehabilitation proceedings. See RSA 402–C:17(V). The Insurance Department has also promulgated extensive regulations concerning health maintenance organizations, pursuant to its authority under RSA 420–B:21. See *N.H.Admin.Ins.* 2200 *et seq.*, Plaintiff's Ex. # 2 (eff. Jan. 1, 1982) (not yet amended to reflect legislation effective July 1, 1989).

There are several other aspects of Beacon that indicate that it is engaged in the "business of insurance". In regard to HMO's generally, RSA 420–B:19 provides, in pertinent part, that "the business of insurance is deemed to include the providing of health care services by a health maintenance organization owned or operated by an insurer or a subsidiary thereof." RSA 420–B:19(I).

Further, the regulatory activities performed by the New Hampshire Insurance Department under Title XXXVII are conceptually the same for HMOs, property and casualty insurance companies, and life, accident and health insurance companies. Robert Solitro, the Director of Examinations for the New Hampshire Insurance Department from 1984 to 1989, prepared a summary chart of statutes and regulations [Plaintiff's Exhibit No. 10] concerning these entities as follows:

### SUMMARY OF REGULATORY ACTIVITY UNDER TITLE XXXVIII, NEW HAMPSHIRE REVISED STATUTES ANNOTATED

| | | P & C | Life & A & H | HMO's |
|---|---|---|---|---|
| 1. | Certificate of Authority or License | 401:1; 402:12 | 401:1; 402:12 | 420–B:2; 420–B:5 |
| 2. | Rates, Prior Approval (Actuarial Review) | 412:8; 412:14; 414 | 415:1 | 420–B:8; Ins 2201.05 |
| 3. | Coverages in Insurance Contracts, Prior Approval | 412:2 | 415:5 | 420–B:8; Ins 2201.06 |
| 4. | Insurance Company Examination/Audit | 400–A:37 | 400–A:37 | 420–B:10 |
| 5. | Application for Certificate of Authority | Ins 700 | Ins 700 | 420–B:3; Ins 2200 |
| 6. | Annual Reports to the Commissioner | 400–A:36 | 400–A:36 | 420–B:9; Ins 2201.08 |
| 7. | Investments | N/A | 411–A | 420–B:15 |
| 8. | Premium Taxes | 400–A:31 & 32 | 400–A:31 & 32 | 420–B:17 |
| 9. | Administration Fund | 400–A:39 | 400–A:39 | 420–B:17 |
| 10. | Licensing of Agents | 402:15 | 402:15 | 420–B:18; Ins 2201.09 |
| 11. | Continuity of A & H Benefits | N/A | Ins 1901.05(d) | Ins 2201.11 |
| 12. | Rehabilitation and Liquidation | 402–C | 402–C | 402–C |
| 13. | Unfair Insurance Trade Practices | 417 | 417 | 420–B:12, II |
| 14. | Procedures and Appeals | 400–A | 400–A | 420–B:14 |
| 15. | Regulation of Advertisement | 406–A; Ins 2600 | 406–A; Ins 2600 | 420–B:12; Ins 2201.06(c)(2) |
| 16. | 39–week Extension | N/A | 415(g)(1)(2) & (4) | 415(g)(1), (2) & (4) |
| 17. | Continuation of Benefits During a Strike | N/A | 415,VII(f) | 415,VII(f) |
| 18. | Coverage for Mental or Nervous Conditions | N/A | 415:18–a,III,b | 415:18–a,III,b |

| 19. Guaranty Fund | P & C<br>404:B | Life & A & H<br>404:D | HMO's<br>N/A |
|---|---|---|---|

As this chart accurately indicates, only one item is applicable to the insurance companies that is not currently available for HMOs, namely guarantee funds are not required for HMOs. Mr. Solitro testified that due to the limited number of HMOs in New Hampshire, any guarantee fund created by HMOs to support an HMO in insolvency would not be a sufficient amount of money. However, 1989 proposed legislation would subject HMOs to guarantee funds.

Under New Hampshire law "Health maintenance organization" is defined in RSA 420–B:1(V) as follows:

[A] public or private organization ... which:

(a) provides or otherwise makes available to enrolled participants health care services;

(b) is compensated for the provision of one or more health care services to an enrolled participant on a primarily predetermined periodic rate basis; [and]

(c) provides physicians' services directly through physicians who are either employees or partners of such an organization, or under arrangements with one or more physicians or groups of physicians.

HMOs in New Hampshire have, inter alia, the "power to furnish health care services on a prepaid basis through providers which are under contract with, otherwise associated with, retained by or employed by the health maintenance organization" and "the power to enter into evidences of coverage to provide an agreed upon set of health care services to enrolled participants or groups of enrolled participants in exchange for a prepaid per capita, or prepaid aggregate, fixed sum." RSA 420–B:7(II) and (V). Further, Beacon has the "power to offer, in addition to health care services, indemnity benefits covering out-of-area or emergency services." RSA 420–B:7 (VIII).

There is one peculiar aspect of the New Hampshire statutory scheme that should be noted. RSA 420–B:12 provides, inter alia, that "no health maintenance organization, unless licensed as an insurer, may use ... any of the words 'insurance,' 'casualty', 'surety', 'mutual,' or any other words descriptive of the insurance, casualty, or surety business or deceptively similar to the name or description of any insurance or surety corporation doing business in this state." RSA 420–B:12(III). However, the reasons for this anomaly were adequately explained in the testimony of the Insurance Commissioner, who was the Vice–Chairman of the Senate Committee on Insurance that handled this legislation. [See Transcript, August 23, 1989, pp. 137–43][1]

*The "Alternate Relief Test" Approach*

The debtor in this case sought to show on the record that the New Hampshire statutory scheme for rehabilitation and/or liquidation of an insurance company was not as *effective* as the scheme under the federal Bankruptcy Code. The court finds this focus to be irrelevant. In legislating the exception to federal bankruptcy relief, Congress said in effect if an entity is an "insurance company" there is no federal relief regardless of any considerations of comparable effectiveness of the state and federal procedures. A bankruptcy court is not authorized in my judgment to ignore the command of § 109(b) of the Bankruptcy Code just because it believes relief in its court will be more effective.

In situations such as *Maxicare* it is understandable that the court there gave considerable weight to the "alternate relief test" approach. With numerous states involved, it arguably might be difficult for the entities to get effective, coordinated relief in the individual states. There was also the overall holding company involved in the *Maxicare* filings. However, such circumstances are not before this court and, accordingly, this court declines to

---

**1.** Suffice it to say that if a sign is placed on the neck of a duck saying it is "not a duck" that doesn't mean it is not a duck.

adopt the approach taken by the *Maxicare* court. Moreover, as indicated above I do not find the underlying rationale compelling in any event, i.e., the fact of numerous states involved as being determinative as to whether an entity is within the exclusions of section 109(b). Such an argument could be made in the case of any large, multi-state insurance company, for example, the Metropolitan Life Insurance Company. Such a company may be doing business in all 50 states, and hence may be regulated nationwide, yet it is beyond reasonable dispute in my judgment that such a company is a "domestic insurance company" within the meaning of section 109(b) of the Bankruptcy Code.

## CONCLUSION

The State contends that Beacon is an insurance company because Beacon "issue[s] contracts of insurance which require the payment of premiums by subscribers in return for the insurer's assumption of the economic risk of furnishing health-care services." The debtor argues that Beacon is not an insurance company because there are "fundamental differences between an HMO, which ... must arrange for health care services and provide physicians' services to its members, and an insurance company, which indemnifies its policyholders against the cost of such services." The debtor focuses on the concept of indemnification as the key factor in determining whether an entity is an insurance company, and associates the concept of indemnification with cash payments. However, this court takes a broader view of the concept of indemnification.

"Indemnification" is defined as "the action of securing against hurt, loss, or damage" or "the action of compensating for incurred hurt, loss, or damage". *Webster's Collegiate Dictionary* 612 (9th ed. 1983). Some of the synonyms of "indemnify" may give a cash connotation to the word. Such synonyms are:

> Grant monetary compensation, pay, pay back, pay compensation, pay reparations, recompense, recompense for past laws,

refund, reimburse, remunerate, repay, [and] return money paid out.

Burgman, *Legal Thesaurus* 273–274 (1980). However, other synonyms include:

> Answer for, compensate, compensate for injury, compensate for loss, compensate for loss sustained, guarantee, make good, make good against anticipated loss, make reparation, make restitution, make up, offer compensation, offer reparation, offer satisfaction, restore, secure against damage, [and] secure against loss.

*Id.* Thus, it appears that "indemnification" is *not* limited to the narrow meaning of payment in *cash.*

Furthermore, notwithstanding the definition of "indemnification", I do not find the indemnification factor to be the sole determinant identifying an insurance company, nor has any court so held, with the possible exception of the California Bankruptcy Court in the *Maxicare* cases. Rather, as noted earlier in this opinion, the Supreme Court has focused upon the concept of risk-spreading in defining the business of insurance. See, e.g., *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), *Group Life Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 *reh'g denied* 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), *cert. denied after remand* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985).

The fact that HMOs generally provide health services themselves, rather than reimbursing the subscriber for health services obtained elsewhere, is not dispositive. The provision of services as opposed to direct indemnification is merely a service in kind rather than cash. The HMO is simply an insurance company covering its obligation to protect subscribers against medical care charges in excess of the premium collected from them by providing the services directly in kind, or indirectly in kind through contract physicians, rather than after-the-fact reimbursing in cash for charges paid directly by the subscriber elsewhere. From the viewpoint of the subscriber/policy holder, there is no functional difference between an HMO and an insurance company. It is immaterial to the sub-

scriber/policy holder whether the services are provided directly or the cost of services provided elsewhere are reimbursed. In either situation the subscriber/policy holder pays a fixed charge or premium that by definition will not cover the cost of services used if medical care actually proves to be necessary for the particular subscriber.

Admittedly, this matter is a close question in one sense because it depends upon the overall view of how the intent of Congress should be interpreted. Should Congress' intent be interpreted narrowly in terms of the types of insurance companies that were extant at the time section 109 was enacted? Or should Congress' intent be interpreted broadly in terms of the essential nature of insurance companies, regardless of the form of their future development? This court takes the latter view, while some courts, such as the *Maxicare* court, apparently take the former view.

In accordance with the foregoing, this case will be dismissed on the grounds that Beacon is a "domestic insurance company" within the meaning of sections 109(b) and (d) and, hence, Beacon cannot be a debtor under chapter 7 or 11 of the Bankruptcy Code. A separate Order of dismissal shall be entered in accordance with this Opinion.