**Stephen F. SELCKE, Director of Insurance of the State of Illinois, Plaintiff–Appellant,**

v.

**MEDCARE HMO, Defendant–Appellee.**

No. 92 C 5704.

United States District Court, N.D. Illinois, E.D.

Dec. 1, 1992.

Roland Burris, Atty. Gen., James R. Carroll, Roger P. Flahaven, Asst. Attys. Gen., Barry B. Gross, Clifford E. Yuknis, Cary E. Donham, Sp. Asst. Attys. Gen., Shefsky & Froelich Ltd., Chicago, IL, for plaintiff-appellant.

James H.M. Sprayregan, Geoffrey Slaughter, Kirkland & Ellis, Chicago, IL, for defendant-appellee.

Irving M. Friedman, Denise S. Poloyac, Katz, Friedman, Schur & Eagle, Chicago, IL, for amicus curiae Local 73 Trust Fund.

Ann Gillespie Pieterick, Arlington Heights, IL, for amicus curiae Illinois Ass'n of Health Maintenance Organizations.

Wm. Carlisle Herbert, Mary Kay McCalla, Hopkins & Sutter, Chicago, IL, for amicus curiae The Illinois Health Maintenance Organization Guar. Ass'n.

William F. Dolan, Bickel & Brewer, Chicago, IL, for amicus curiae the University of Chicago Hospitals.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Defendant-appellee MedCare HMO ("MedCare") has petitioned for voluntary Chapter 11 bankruptcy. Plaintiff-appellant Stephen F. Selcke, Director of Insurance of the State of Illinois ("the Director"), appeals the bankruptcy court's refusal to dismiss MedCare's petition on the ground that MedCare is not a debtor under 11 U.S.C. § 109(b) because it is a "domestic insurance company." This court granted the Director leave to take an interlocutory appeal pursuant to 28 U.S.C. § 158(a), *see Selcke v. MedCare HMO*, No. 92 C 5704, Min.Ord. (N.D.Ill. issued Sept. 30, 1992), and now reverses.[1]

## BACKGROUND

MedCare is a not-for-profit Illinois corporation licensed and operating since 1985 as a health maintenance organization ("HMO"). It is the seventh largest HMO in the Chicago metropolitan area, serving approximately 54,000 enrollees. MedCare is licensed by Illinois only as an HMO, not as an insurance company.

MedCare, like other HMOs, provides a variety of services. Each of its customers,

or enrollees, pays MedCare a fixed monthly premium. In return, MedCare arranges and pays for the delivery of the health care services required by the enrollee. MedCare provides various corrective health care services: Physician services, hospital care, skilled nursing care, extended care and intermediate care facilities, home health care, pharmacy services, medical appliances and ambulance services. It also provides numerous preventative services, including prenatal care, a healthy kids program, regular adult physical examinations and preventative tests.

In some respects, MedCare's business closely resembles that of a direct health care provider—like a hospital. For example, MedCare generally contracts with physicians through thirty-nine associations to provide their services to MedCare enrollees. MedCare pays the associations an upfront or "capitated" monthly fee to provide enrollees with physician's services. This capitated fee does not vary with the frequency of enrollee visits or the physician's actual cost in providing services. In areas where it is unable to contract with physician associations, MedCare provides physician's services directly through its own health care clinics. MedCare provides hospital services through contracts with hospitals that call for MedCare to pay a *per diem* fee for each occupied bed; the *per diem* fee also does not vary with the hospital's actual cost of services.

In other ways, MedCare's operations mirror those of an insurance company. From an enrollee's point of view, for example, MedCare assumes the risk of health care costs in exchange for a monthly fee. Even though MedCare pays a flat *per diem* rate for hospital services, it retains much of the risk presented by hospital costs because MedCare cannot predict either the frequency or length of enrollee hospital visits. In other circumstances, MedCare becomes a

---

**1.** The court also granted leave to all interested parties requesting to file *amicus curiae* briefs. Local 73 Trust Fund emphasized the interests of enrollees in the Illinois HMO Act liquidation provisions, and the Illinois Association of HMOs stressed that the legislative rationale of the "domestic insurance company" exception applies to

HMOs. The Illinois HMO Guaranty Association also supported the Director with a comprehensive general analysis of the problem. Finally, the University of Chicago Hospitals urged that even if MedCare is an eligible debtor, the Illinois guaranty fund provisions should remain available.

898

strict indemnitor. Whenever an enrollee requires emergency medical services, or obtains services outside MedCare's service area, MedCare is required by statute to indemnify the enrollee for the cost of the services. MedCare has also been unable to mitigate the risk of many of the other services it provides—MedCare pays for over two-thirds of the services it provides on a fee-for-service regime under which it retains the full risk of the frequency and severity of the costs.

Illinois law recognizes the hybrid nature of HMOs. A corporation may be certified as an insurance company, an HMO, or both. However, both HMOs and insurance companies are supervised by the Director of Insurance. *See, e.g.,* Ill.Rev.Stat. ch. 111½, ¶ 1415. Illinois has comprehensive regulatory schemes for both insurance companies and HMOs.[2] The schemes are distinct and may be found under separate chapters in the Illinois code. *Compare* Ill. Rev.Stat. ch. 111½, ¶ 1401 *et seq.* (HMO Act) *with id.* ch. 73, ¶ 613 *et seq.* (insurance code). But the HMO regulations fairly mirror the insurance regulations; often the HMO regulations just incorporate the insurance regulations by reference. *See, e.g.,* Ill.Rev.Stat. ch. 111½, ¶¶ 1409.4, 1409.-5(c), 1411.2(a), 1412, 1414, 1417, 1418.11. Illinois has established a separate HMO guaranty fund similar to that for insurance companies. *Compare id.* ch. 73, ¶ 1065.80-1 *et seq. with id.* ch. 111½, ¶ 1418.1 *et seq.* Illinois also subjects HMOs to the same state liquidation and rehabilitation schemes as insurance companies, giving enrollees a priority over general creditors.

MedCare's current troubles began when the Director issued a "Notice of Impairment" to MedCare in March 1992. The notice gave MedCare thirty days to correct an impairment of its net worth of over $5 million. After it obtained an extension from the Director, MedCare filed a volun-

tary petition for Chapter 11 bankruptcy relief on June 3, 1992. MedCare currently operates as a debtor in possession.

The bankruptcy court subsequently granted the Director leave to intervene in the Chapter 11 proceedings. The Director moved to dismiss the petition on the ground that MedCare is not an eligible debtor under 11 U.S.C. § 109(b) because it is a "domestic insurance company."[3] The bankruptcy court took three days of testimony on the issue. At the conclusion of the hearing, the bankruptcy court ruled orally that MedCare is not a "domestic insurance company":

> It's clear to me from the testimony that HMOs are a different animal. They are unlike insurance companies, even though they indemnify. They indemnify like insurance companies.... But that does not make them an insurance company.

7/22/92 Tr. at 323.

This court granted the Director's motion for leave to take an interlocutory appeal under 28 U.S.C. § 158(a). Whether MedCare is a "domestic insurance company" under Section 109(b) presents a disputable controlling question of law, the resolution of which materially advances this litigation.

## DISCUSSION

This court reviews the factual findings of the bankruptcy court for clear error, but the bankruptcy court's legal conclusions receive *de novo* review. Fed.R.Bankr.P. 8013; *In re Newman,* 903 F.2d 1150, 1152 (7th Cir.1990). The powers and responsibilities of insurance companies and HMOs may raise questions of fact or of law. But given particular factual findings, the ultimate question of whether an entity is a domestic insurance company under Section 109(b) remains one of law—regardless of the test applied. Thus, accepting the bankruptcy court's factual findings regarding the powers of HMOs as true unless clearly

**2.** Among other things, Illinois regulates the review, establishment and domestication of insurance companies and HMOs, sets minimum capital and reserve requirements for them, circumscribes their investment opportunities, imposes reporting requirements on them and gives the

Director broad authority in matters of infractions or insolvency.

**3.** The Director also asserted that MedCare's bankruptcy filing was in bad faith, and relied on various federal abstention doctrines. Those grounds are not before this court.

erroneous, the bankruptcy court's conclusion is nonetheless reviewed *de novo*.

The Director argues that the bankruptcy court erred when it refused to dismiss MedCare's petition for lack of jurisdiction.[4] The Director contends that the bankruptcy court lacks jurisdiction because MedCare is a domestic insurance company under Section 109(b). Any person who resides or has a domicile, place of business or property in the United States may be a debtor. 11 U.S.C. § 109(a). However, a person may be a debtor only if that person is not a domestic insurance company. *Id.* § 109(b)(2). The bankruptcy court's jurisdiction thus turns on whether MedCare, an Illinois HMO, is a "domestic insurance company" under Section 109(b)(2). The question is one of first impression in this circuit.

■ A petitioner may be a Section 109(b) excluded entity under either of two lines of analysis—the independent classification test or the state classification test. *In re Cash Currency Exchange, Inc.*, 762 F.2d 542, 548 (7th Cir.1985). *Accord* 2 King, *Collier on Bankruptcy* § 109.02 (15th ed. 1985). The independent classification test construes Section 109(b) itself, considering the text of the section, its legislative history and court interpretations, to determine whether a petitioner is an excluded entity. *Id.* at 552; *In re Beacon Health, Inc.*, 105 B.R. 178, 180 (Bankr. D.N.H.1989). Section 109(b), which must be construed narrowly, *see Cash Currency*, 762 F.2d at 552, does not by its terms exclude HMOs. Moreover, at the time of the last amendments to the section, Congress was fully aware of the existence of HMOs: Congress had enacted a federal regulatory scheme for HMOs. *See In re Family Health Services, Inc.*, 104 B.R. 268, 272–73 & n. 1 (Bankr.C.D.Cal.1989); 42 U.S.C. § 300e.

■ In the face of the plain terms of Section 109(b) and the implications of the legislative history, the Director urges an application of the test that places dispositive weight on the underlying rationale of the section. Because HMOs have a public nature and their own state liquidation schemes, the Director asserts that HMOs fall within the professed legislative justification of the section. *Cf. Beacon Health*, 105 B.R. at 180. But the object of this test is to determine what Congress actually intended to be excluded, not what its underlying reasoning could support. Bearing that in mind, the plain terms of the Section along with Congress' failure to amend them to include HMOs are more persuasive than the justification for the exclusions. Section 109(b) thus does not independently provide that HMOs are excluded entities.

■ The state classification test, which examines the entity's status under the law of the state of incorporation, proceeds in two steps. First, if state law classifies the entity as one specifically excluded under Section 109(b), that is generally dispositive. *Cash Currency*, 762 F.2d at 548. Thus, if Illinois law classifies MedCare as a "domestic insurance company," it is an excluded entity and the bankruptcy petition should be dismissed. But even if state law does not formally place the entity in an excluded class, the entity may nonetheless be excluded under the second step of the test if it is the "substantial equivalent of those in the excluded class." *Id.* MedCare is an excluded entity under both these lines of analysis.

■ Although the Illinois statutory provisions regulating insurance companies and HMOs are found in different places, Illinois classifies HMOs as domestic insurance companies—particularly for purposes of liquidation. All HMOs are expressly subject to the Insurance Codes' liquidation provisions, Articles XIII and XIII½. Ill.Rev. Stat. ch. 111½, ¶ 1411.2(a). More to the point, the HMO Act provides that

For purposes of the Illinois Insurance Code, except for [the provisions relating

---

**4.** As MedCare points out, at least one court has treated the question as one of prudence rather than jurisdiction. *See, e.g., In re Grouphealth Partnership, Inc.*, 137 B.R. 593 (Bankr.E.D.Pa. 1992). The law of the Seventh Circuit is to the contrary. *See In re Cash Currency Exchange, Inc.*, 762 F.2d 542, 545, 546 (7th Cir.1985) (Section 109(b) motion was "challenge to the bankruptcy court's jurisdiction"), *cert. denied*, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232.

to liquidation and insolvency], Health Maintenance Organizations in the following categories are deemed to be "domestic companies":

\*　　\*　　\*　　\*　　\*　　\*

(2) a corporation organized under the laws of this State;

\*　　\*　　\*　　\*　　\*　　\*

*Id.* ¶ 1411.2(b). *See also id.* ¶ 1414(b) (similar language applying only to liquidation and insolvency provisions). The Illinois Insurance Code in turn provides that

In this Code, unless the context otherwise requires,

\*　　\*　　\*　　\*　　\*　　\*

(e) "Company" means an insurance or surety company ...

(f) "Domestic Company" means a company incorporated or organized under the laws of this State.

*Id.* ch. 73, ¶ 614. Taken together, these two provisions establish that at least for some purposes, Illinois formally classifies domestic HMOs as domestic insurance companies.[5]

The HMO Act also provides that

For purposes of the rehabilitation, liquidation or conservation of a health maintenance organization, *the operation of a health maintenance organization in this State constitutes a form of insurance protection which should be governed by the same provisions governing the rehabilitation, liquidation or conservation of insurance companies.* Any rehabilitation, liquidation or conservation of a Health Maintenance Organization shall be based upon the grounds set forth in and subject to the provisions of the laws of this State regarding the rehabilitation, liquidation, or conservation of an insurance company and shall be conducted under the supervision of the Director.

*Id.* ch. 111½, ¶ 1414(a) (emphasis added). This section is unambiguous: Illinois law classifies HMO services as a form of insurance protection, at least insofar as the rehabilitation, liquidation and conservation of HMOs are concerned. Together with the elaborate scheme for liquidation set out in the Insurance Code and supplemented by HMO Act provisions, this section establishes that under Illinois law, MedCare would be considered a domestic insurance company within the context of issues relating to insolvency.

MedCare's argument to the contrary has several strands. MedCare points out that the separate and differing statutory schemes show that Illinois recognizes that HMOs and insurance companies are different. And, as the deputy director of the Department of Insurance admitted at the hearing, MedCare argues that this difference is evident because a company authorized only as an HMO could not sell "pure mere indemnification" insurance without separate authorization.[6] While these arguments are not without merit, MedCare confuses membership in the same class with being intrinsically identical. There is no doubt that HMOs are an amalgam of other traditional entities. HMOs and insurance companies have some qualities in common and some differences. But, like snowflakes, no two insurance companies are completely identical entities either. The utility of a classification is that it focuses

---

5. MedCare insists that these provisions merely define domestic companies—that is, corporations located in Illinois but engaged in any kind of business—and have nothing to do with insurance companies. *Amicus curiae* Illinois HMO Association argues the other extreme, that these provisions are a wholesale classification of HMOs as insurance companies. There is truth in both positions. On the one hand, the statutory emphasis is on distinguishing a foreign company from a domestic one because all HMOs are made subject to the Insurance Code by other provisions. On the other hand, the end result is that for many purposes, including liquidation,

Illinois classifies (or "deems") domestic HMOs as domestic insurance companies.

6. MedCare also points out that a bankruptcy court in the Central District of California resolved the question to the contrary in another case involving an Illinois HMO, *Family Health Services.* While it makes sense to consider the reasoning employed by that court, the result it reached is not binding. More fundamentally, the *Family Health Services* court did not evaluate each of the provisions of the HMO Act considered here, and some provisions were not yet in effect. *See* 104 B.R. at 273–77.

on certain characteristics to determine if, for a particular purpose, the entities should be treated alike. In Paragraph 1414(a), the Illinois legislature specifically concludes that from the viewpoint of enrollees and for purposes of liquidation, HMOs should be classified domestic insurance companies. Because the legislature's classification is given considerable weight, *cf. Cash Currency*, 762 F.2d at 551, this court holds that MedCare is an excluded entity under Section 109(b).

■■■ MedCare is also an excluded entity because it is the substantial equivalent of a domestic insurance company. Whether a petitioner is the substantial equivalent of an excluded entity depends on a comparison of the powers conferred on and withheld from the two entities; whether the petitioner is subject to extensive state regulation like the entity in the excluded class; whether the petitioner is subject to express statutory liquidation or rehabilitation procedures; and whether it conducts business of a public or quasi-public nature. *Cash Currency*, 762 F.2d at 548. MedCare argues that HMOs are not the substantial equivalent of insurance companies because their powers differ. For example, HMOs are restricted to providing health-related services while insurers may issue strict indemnification insurance covering a variety of risks. Insurers may not direct policyholders to a particular hospital or physician, but HMOs generally restrict enrollees to the HMO network. Insurers also must maintain claim reserves while HMOs need not, and there are separate guaranty funds for the entities.

■■■ Once again, it is beyond dispute that an HMO is not identical to an insurance company in every way. But they are substantially equivalent in two ways. First, insurance companies and HMOs share the same essential attributes—risk pooling and indemnification. *Cf. Cash Currency*, 762 F.2d at 550 (accepting deposits was "essential attribute" distinguishing banks from currency exchanges in substantial equivalent analysis). The essential attribute of an insurance company is that, for a premium, it agrees to indemnify an insured for a potential loss, thereby spreading the risk among insureds. *Griffin Systems, Inc. v. Washburn*, 153 Ill. App.3d 113, 106 Ill.Dec. 330, 505 N.E.2d 1121 (1987). *Accord Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211–13, 99 S.Ct. 1067, 1073–74, 59 L.Ed.2d 261 (1979); *In re Portland Metro Health*, 15 B.R. 102, 104–05 (Bankr.D.Ore.1981). The bankruptcy court found that MedCare indemnifies like an insurance company. From an enrollee's point of view, MedCare provides insurance. In exchange for a fixed monthly premium, MedCare agrees to make available whatever health care services an enrollee requires and thereby assumes the enrollee's risk of loss. MedCare may provide services in kind, unlike traditional insurers, but there is little difference in the bargain from an enrollee's viewpoint. *See Portland Metro Health, Inc.*, 15 B.R. at 104–05; *Beacon Health*, 105 B.R. at 186. Courts interpreting Section 109(b) and its predecessors have long considered the public or quasi-public nature of an entity. *See, e.g., In re Union Guarantee & Mortgage Co.*, 75 F.2d 984, 984 (2d Cir.1935). Thus, it is proper to take into account the essential attribute of an entity from a public perspective—here, the enrollee.

As to the other factors in the substantial equivalent analysis, there is no dispute that MedCare is subject to regulation as extensive as the regulation of domestic insurance companies. And the full scheme for liquidation and rehabilitation of domestic insurance companies applies to MedCare and other Illinois HMOs. Finally, there can be no doubt that MedCare is invested with a public interest. MedCare has over 50,000 enrollees in the Chicago metropolitan area who MedCare has promised to indemnify. Moreover, Illinois has recognized the public nature of HMOs by creating a guaranty fund specifically to protect enrollees in the case of HMO insolvency.

■■■ MedCare also argues that "Congress and the courts recognize that HMOs are not insurance companies." MedCare Br. at ii. MedCare points out that Con-

**902**

gress chose to regulate HMOs[7] on the federal level while leaving the supervision of insurance companies to the states, and that Medicare imposes quality control requirements on HMOs but not on insurance companies. Insurance companies are also different from HMOs because they are taxed differently than HMOs in order to reflect reserve indemnification requirements, according to MedCare. Finally, MedCare argues that the Supreme Court has ruled that HMOs are not insurance companies.[8]

■ However, MedCare fails to make clear exactly how these arguments fit into the *Cash Currency* analysis. More fundamentally, MedCare's arguments make the same mistake as did the bankruptcy court by focusing on the overall morphology of an Illinois HMO. HMOs are novel. Though neither fish nor fowl, it is sometimes necessary to classify HMOs in terms of pre-extant legal categories. One approach would be simply to decide that HMOs are predominantly insurance companies or predominantly health care providers. But that is not what *Cash Currency* teaches, and this approach ignores the idea that public policies driving a regulatory scheme may apply to a holistically different entity that has some characteristics in common with the regulated entity. Thus, it is sensible to subject HMOs to regulations covering health care providers when HMOs function like health care providers, and to subject HMOs to regulations covering insurance companies when HMOs function like insurers. Whatever the other attrib-

utes of the HMO entity, at least with respect to liquidation and rehabilitation, HMOs are the substantial equivalent of insurance companies.

■ Finally, refusing to exclude MedCare under Section 109(b) would undermine a detailed state regulatory process that Congress manifestly intended to honor. In the McCarran–Ferguson Act, Congress expresses an unambiguous intent to leave the regulation and taxation of insurance to the states. 15 U.S.C. §§ 1011–12; *Royal Drug*, 440 U.S. at 217–18, 99 S.Ct. at 1076. To be sure, the existence of a statutory scheme for liquidating an entity is not alone enough to qualify the entity for exclusion under Section 109(b). *Cash Currency*, 762 F.2d at 551. But here Illinois has not just provided a scheme; the state has made a legislative finding that domestic HMOs are domestic insurance companies for purposes of liquidation. *See* Ill. Rev.Stat. ch. 111½, ¶ 1414. Moreover, an inherent part of the Illinois scheme is giving higher priority to enrollees than to general creditors. *Cf. Cash Currency*, 762 F.2d at 551 (pointing out that currency exchange liquidation scheme did not protect public). There is no allegation that the state's findings are a pretext of some sort; Illinois has defined the HMO entity and has designated that, for the purposes of liquidation, an HMO is an insurer. There is more than adequate support in the record for the state's conclusion. Refusing to exclude HMOs would do violence to the Congressional intent underlying Section 109(b) and the McCarran–Ferguson Act.

7. MedCare also asserts that Illinois' liquidation scheme has been preempted by the federal HMO Act, especially 42 U.S.C. § 300e–10. This section, however, does not provide an alternate liquidation scheme; it refers to *initial* capitalization amounts. Besides, the section only applies to qualified HMOs or those that have received funds from the federal government. *Id.* § 300e–10(a)(2). MedCare falls into neither of those categories. Director's Reply Ex. A. And even if it did, state provisions that do not expressly conflict with the federal HMO Act are not generally preempted. *See Health Care Plan, Inc. v. Schweiker*, 553 F.Supp. 440, 446 (D.N.J.1982), *aff'd without opinion*, 707 F.2d 1391 (3d Cir.), *and cert. denied*, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983).

8. MedCare relies on *Royal Drug*, 440 U.S. at 225–27, 99 S.Ct. at 1080–81 for this proposition. What the court actually held is that, for purposes of determining an exemption from antitrust liability, the *business* of providing health care is different from the business of providing insurance. *Id.* There was no doubt that the defendant, Blue Cross, was an insurance company. *See, e.g., id.* at 209, 217, 99 S.Ct. at 1072, 1076. The Court held that Blue Cross was not engaging in the business of insurance by making direct agreements with pharmacies to provide drugs to insureds. *Id.* at 217, 99 S.Ct. at 1076. This case further illustrates that being an insurance company is not an all-or-nothing proposition.

## CONCLUSION

The order of the bankruptcy court is reversed. The petition of defendant-appellee MedCare HMO for voluntary Chapter 11 bankruptcy is dismissed for lack of subject matter jurisdiction.